Roni **LEWIS, Plaintiff,**

v.

**J.C. PENNEY COMPANY, INC., a Corporation of the State of Delaware, Milton L. Draper, and Robert James Lyall, Defendants.**

**Civil Action No. 95–535 MMS.**

United States District Court, D. Delaware.

Argued Nov. 20, 1996.

Decided Dec. 6, 1996.

**14.** *See supra* note 13.

Rory Colton Godowsky, Green, Green, Godowsky & McFadden, Wilmington, DE, for plaintiff.

Stephen P. Casarino, and Diane M. Willette, Casarino, Christman & Shalk, Wilmington, DE, for defendants.

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### INTRODUCTION

Plaintiff Roni Lewis ("Lewis") filed a complaint against J.C. Penney Corporation and two of its security guards, Milton Draper and Robert Lyall, alleging race discrimination under 42 U.S.C. § 1981, violation of her Fourth Amendment rights under 42 U.S.C. § 1983, and state law causes of action including defamation, false imprisonment and intentional infliction of emotional distress. Jurisdiction is based on 28 U.S.C. §§ 1331, 1343 and 1367. Lewis' claims stem from her being falsely accused of shoplifting while at J.C. Penney. Before the Court is defendants' motion for summary judgment as to all claims. For the reasons that follow, the Court will grant defendants' motion in its entirety.

### FACTS

On November 30, 1994, Lewis and her friend Linda Sebell ("Sebell") went shopping at a J.C. Penney store located in the Christiana Mall in Newark, Delaware. A6, 60; B2.[1] Lewis and Sebell are co-workers at the U.S. Post Office. A4, 58–59. Lewis is black and Sebell is white. A47. They were accompanied by three children: Lewis' daughter JaVee O'Neal ("JaVee"), age 6, Lewis' son Kenneth Brown, age 15, and Kenneth's best friend Richard McDonough, age 14. A4–5; B3–4. The boys went off by themselves soon after arriving at the mall, while JaVee remained with Lewis and Sebell. A7, 64; B4.

The two women made a number of purchases at J.C. Penney. A8, 65–66; B5–6. Each woman eventually consolidated her

---

**1.** These cites refer to the parties' supporting appendices accompanying their briefs. "A" cites originate from Appendix to Opening Brief in Support of Motion by Defendants for Summary Judgment (Docket Item ["D.I."] 27); "B" cites originate from Appendix to Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment (D.I. 30); "C" cites originate from Reply Brief in Support of Defendants' Motion for Summary Judgment (D.I. 31).

purchases, each into respective large bags. A66–67. Lewis and JaVee separated from Sebell for part of the shopping trip. A17–18. The two women shopped until the store closed. A71. Pursuant to a pre-arranged plan, Kenneth and Richard were waiting outside the exit door of J.C. Penney when Lewis, JaVee and Sebell were let out of the locked door by a J.C. Penney staff member who was closing the store. A24, 71.

During Lewis' and Sebell's visit to the store, a store employee had become suspicious of the two women and alerted security. A126. There was no mention of the race of either woman in the original verbal report; however, race was mentioned in the report filed by defendant Draper after the incident. A126, B35–36. Defendant Draper began surveillance of the two women and, when Lewis and Sebell began to shop separately, he followed Lewis. A129. At that point, defendant Lyall followed Sebell. A103. Lewis and Sebell were followed because, in the guards' opinions, they displayed nervous behavior, avoided sales help and were shopping in darkened, deserted areas of the store. A103, 114, 134–135, 146. In his report filed after the fact, Draper commented that he noticed several black males waiting outside the exit door, apparently referring to Kenneth and Richard, B32–33.

Draper and Lyall approached Lewis, Sebell and the children after they left the store, as the group was approaching Lewis' car. A26, 71; B13. The two women were asked to return to the store for the guards to inspect their bags. A33; B13. The children were not permitted to follow and remained locked outside the door. B14. The guards conducted the search near the entrance in full view of anyone walking in or out of the store instead of in the loss prevention office; the latter is the designated spot under company policy for a search of suspected shoplifters. B38.

At this point the parties' accounts begin to differ. Defendants assert Sebell cooperated with the guards, while Lewis did not. A33–34. Sebell allowed the guards to inspect her purchases while Lewis indicated she would not show the guards her purchases until they called the police and arrested her. A34. Finally, Lewis turned her bag upside down and dropped its contents on the floor. A39. The guard was able to recover receipts for all the items purchased by Lewis. A39–40. Yet, after ascertaining that Lewis' bags contained no stolen merchandise, the guard requested identification from her and questioned her about a discrepancy between the name on her charge card and the name on her work identification card.[2] A40–41. Lewis declined to answer the guard, stating "Why does it matter," and "It's none of your business." A42. After the guards indicated the women were free to leave, Lewis asked for and received some gift boxes, as had Sebell while waiting for Lewis. A43. One of the guards apologized to the women. A44. The incident lasted between ten and twenty minutes. A45, 83.

In plaintiff's opinion, on the other hand, the search of Lewis' packages was completely different from that of Sebell's. "The officer simply looked at Ms. Sebell's bag without asking that the bag be emptied and he glanced at the receipt." D.I. 29, at 6 (citing B21–22). Sebell asserted in her deposition that the guards more or less ignored her until Lewis pointed that out, and asked "Are you checking both of us?" A76. At that point, one agent made a cursory search of Sebell's bags, despite the fact that Sebell had accumulated far more merchandise than Lewis, and was therefore the more likely shoplifting suspect. A85–86; B20. Sebell felt she was searched only because she was with Lewis. B20. Lewis further stated that the guards were very hard on her and made her feel intimidated. A37. Her children were upset after watching the scene. A50.

After the incident, while both women spoke with the store's loss prevention manager, Mr. Ruiz, B26, 40–41, only Sebell received a gift certificate and an apology in the mail. B27. Mr. Ruiz admits he knew Lewis never received an apology. B42. Defendants explain Sebell actually came to the store to speak with Mr. Ruiz, demanded a written apology, and left her name and address with

---

**2.** The difference was her work identification card indicated her last name was O'Neal, her former married name, while her J.C. Penney card bore the name Lewis. A41–42.

him. C7. On the other hand, when Lewis spoke with Mr. Ruiz by telephone about the incident, she disputed his statement of events and told him not to call her again. C5–6. She declined to give Mr. Ruiz her address. C6. Thus, even though the store manager wished to send both women a letter and apology, Mr. Ruiz did not know where to reach Lewis, and felt she had made it clear she did not wish any further contact with the store. C8. Lewis disputes Ruiz's account and notes J.C. Penney could readily obtain her address by looking up the records on her J.C. Penney charge card.

## MOTION FOR SUMMARY JUDGMENT

Defendants have filed a motion for summary judgment as to all counts of Lewis' complaint. In response to Lewis' claim of race discrimination under 42 U.S.C. § 1981, defendants assert she has not put forth evidence to demonstrate that defendants *intentionally* discriminated against her because of her race, and she has not stated a claim that is covered by section 1981. In response to Lewis' claim under 42 U.S.C. § 1983, defendants urge Lewis has not adduced evidence to support the required element of state action necessary to bring a claim under section 1983. Defendants finally argue Lewis' state claims should be dismissed because supplemental subject matter jurisdiction should not be exercised upon the Court's award of summary judgment on Lewis' federal claims.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is governed by Federal Rule of Civil Procedure 56, and will be granted when, on the record before the Court, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In order to defeat 'a properly supported summary judgment motion, the party opposing it must present sufficient evidence for a reasonable jury to find in its favor.'" *Hampton v. Borough of Tinton Falls Police Dep't,* 98 F.3d 107, 112 (3d Cir. 1996) (citation omitted).

> In essence, the non-moving party must demonstrate a dispute over facts that might affect the outcome of the suit....

Moreover, in reviewing the record, we must give the non-moving party the benefit of all reasonable inferences.

*Id.*

Additionally, summary judgment is appropriate if, after discovery is taken, a party can not put forth any facts establishing a required element of its cause of action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In such a case, "there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

## II. 42 U.S.C. § 1981

The text of section 1981 states in pertinent part:

(a) Statement of equal rights: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined: For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment: The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of state law.

Subsections (b) and (c) of the statute are recent amendments pursuant to the Civil Rights Act of 1991. Subsection (b) is in part a response to the Supreme Court's decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). *See Rivers v. Roadway Exp., Inc.,* 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274

(1994) (explaining the amendment of section 1981). *Patterson,* an employment discrimination case, held the "make and enforce contracts" clause of section 1981 was limited to making and enforcing contracts; therefore, the statute did not provide employees with a cause of action for discrimination in the conditions of employment occurring after the formation of an employment contract. Congress' amendment demonstrates its disagreement with such a limited reading of the statute; accordingly, section 1981 can now be said to cover "all phases and incidents of the contractual relationship, including discriminatory contract terminations." *Rivers,* 511 U.S. at 302, 114 S.Ct. at 1514.

Section 1981 claims are analyzed under the burden-shifting framework developed in Title VII cases including *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Dirden v. Department of Hous. and Urban Dev.,* 86 F.3d 112, 114 (8th Cir.1996). Accordingly, with respect to her section 1981 claim, plaintiff must establish a prima facie case as follows: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in [section 1981]...." *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993); *accord Morris v. Office Max. Inc.,* 89 F.3d 411, 413 (7th Cir.1996); *Croker v. Boeing Co.,* 662 F.2d 975, 989 (3d Cir.1981) (holding that section 1981 claim requires proof of intentional discrimination). Upon a prima facie showing by plaintiff, the burden shifts to defendants to assert "legitimate, nondiscriminatory" reasons for their actions. *Dirden,* 86 F.3d at 114. If defendants put forth such reasons, plaintiff may then attack defendants' reasons as pretextual. *Id.*

In the present case, the Court will grant summary judgment for defendants based on Lewis' failure to establish a required element of her cause of action, *see Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Specifically, she has not established the discrimina-

tion concerned one or more of the activities enumerated in section 1981.

A close look at section 1981 indicates that such covered activities are: (1) the making and enforcement of contracts, (2) the ability to sue, be party to a lawsuit and give evidence, (3) the full and equal benefit of all laws and proceedings for the security of persons and property, and (4) liability for punishment, pains, penalties, taxes, licenses, and exactions.

■ The parties agree that Lewis' claim potentially implicates only the first and third clauses of section 1981, the "make and enforce contracts" clause or the "full and equal benefit of all laws." The latter position is rejected, however, because the Third Circuit Court of Appeals has opined that private defendants, as opposed to state actors, cannot deprive individuals of the full and equal benefit of all laws. *Mahone v. Waddle,* 564 F.2d 1018, 1029 (3d Cir.1977), *cert. denied sub nom City of Pittsburgh v. Mahone,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). As will be discussed below, in connection with Lewis' section 1983 claims, defendants here are not state actors.

■ In order to survive summary judgment, therefore, Lewis must show that her claim falls under the "make and enforce contracts" clause of section 1981. As evidenced by Congress' recent amendment, that clause is not to be read narrowly; section 1981 covers "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Yet, the requirement still remains—plaintiff must point to some contractual relationship with J.C. Penney in order to bring her claim.

At oral argument, plaintiff's counsel claimed the existence of an unstated, unwritten contract between commercial establishments and the public, that all who enter premises of the former will be treated equally regardless of race. The Court is not persuaded this nebulous contract theory salvages plaintiff's lawsuit. Allowing plaintiff to proceed under such a theory would come close to nullifying the contract requirement

of section 1981 altogether, thereby transforming the statute into a general cause of action for race discrimination in all contexts. The Court does not believe Congress intended such a result.

The cases cited by the parties do not compel an opposite result; not a single case was cited in which a customer, falsely accused of shoplifting, was permitted to proceed on a section 1981 claim. The closest such case is *Washington v. Duty Free Shoppers, Ltd.*, 710 F.Supp. 1288 (N.D.Cal.1988). In that case, the court denied summary judgment for defendants, a store and one of its employees, in a section 1981 case brought by seventeen black plaintiffs who were systematically refused service. *Id.* at 1290. The case is distinguishable from the present case, however, because defendants in *Duty Free Shoppers* truly were refusing to contract with the plaintiffs. In the present case, Lewis had done her shopping and was leaving the store; no contractual relationship remained. *See Flowers v. TJX Cos.*, No. 91–CV–1339, 1994 WL 382515, at *6 (N.D.N.Y. July 15, 1994) (holding no section 1981 claim stated because "it is uncontested that plaintiffs completed their retail transactions at T.J. Maxx despite the alleged discrimination of defendants. Because no interference with the formation of an implicit retail contract took place, plaintiffs can not recover damages under § 1981.").

Plaintiff relies on the Third Circuit Court of Appeals' opinion in *Hall v. Pennsylvania State Police*, 570 F.2d 86 (3d Cir.1978), as support for her position that the "make and enforce contracts" clause of section 1981 provides her with a cause of action against defendants. In *Hall*, a black male sued a bank and several state officials alleging he was photographed upon entering the bank pursuant to a racially discriminatory joint policy between the bank and the state to photograph "suspicious" black men and women.

The Court of Appeals held the plaintiff had stated a claim under section 1981. With respect to the government actors, the court found that the claim was covered under the equal benefit clause of section 1981. 570 F.2d at 91. The court also would not dismiss the claim against the bank, opining that

"[s]ection 1981 obligates commercial enterprises to extend the same treatment to contractual customers 'as is enjoyed by white customers.'" *Id.* at 92. Thus, plaintiff argues, the Third Circuit Court of Appeals has agreed that race discrimination claims against commercial establishments may be brought under the ambit of the "make and enforce contracts" clause of section 1981.

*Hall* is a vastly different case from the one *sub judice.* *Hall* involved "a governmental directive which call[ed] for a specified activity directed against a group of citizens identified on the basis of race." 570 F.2d at 89. The court noted, "[t]he crucial factor is the interplay of governmental and private action." *Id.* at 91. It continued:

> This was not the isolated act of an individual employee, but rather the implementation of a policy deliberately adopted by the bank management to offer its services under different terms dependent on race.

*Id.* at 92. In the present case, Lewis has not alleged, or provided any facts suggesting J.C. Penney had a discriminatory policy, or that the discrimination she may have suffered was more than "the isolated act of an individual employee." *See id.* In short, Lewis seeks a federal remedy for being stopped and interrogated with respect to suspected shoplifting. Section 1981 does not provide that remedy, *see Morris v. Office Max, Inc.*, 89 F.3d 411 (7th Cir.1996), however, plaintiff has available whatever causes of action are provided by state law.

### III. 42 U.S.C. § 1983

In Count Three of her complaint, Lewis asserts that defendants Draper and Lyall were state actors who violated her rights under the Fourth Amendment to be free of unreasonable search and seizure. Defendants dispute that Draper and Lyall were state actors, and assert therefore the section 1983 claim may not be maintained.

"In order to establish a section 1983 claim, a plaintiff 'must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law.'" *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d

Cir.1996) (citations omitted). Defendants here are private parties and not government officials; therefore they are liable only if they can be considered state actors for purposes of section 1983.

The Supreme Court in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), set forth a test under which private parties may be held liable under section 1983:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, *because he has acted together with or has obtained significant aid from state officials,* or because his conduct is otherwise chargeable to the State.

*Id.* at 937, 102 S.Ct. at 2753–54 (emphasis added). The question in *Lugar* was whether a private individual who sought prejudgment attachment of another's property, pursuant to a Virginia statute which allowed for attachment based on the one party's ex parte application, was a state actor under section 1983. The Court held that such an individual was a state actor by reason of joint action with the state officials.

In *Cruz v. Donnelly,* 727 F.2d 79 (3d Cir. 1984), the Third Circuit Court of Appeals addressed the specific question of when state action is present in a detention for shoplifting. *Cruz* held summary judgment was appropriate in a section 1983 action against a store and its employee, where the plaintiff established he was subject to unreasonable search and seizure by police at the defendant store's request. The court stated commercial establishments and their employees will only be held liable under section 1983 when:

(1) the police have a pre-arranged plan with the store; and

(2) under the plan, the police will arrest anyone identified as a shoplifter by the store without independently evaluating the presence of probable cause.

*Cruz,* 727 F.2d at 81. The court subsequently found no evidence that police were acting pursuant to a plan with defendants when they searched plaintiff; "[n]owhere does [plaintiff] assert that the police would not strip search him as part of a routine shoplifting investigation...." *Id.*

In *Cruz,* the Third Circuit relied on *Lugar* to explain the policy behind its rule: *"Lugar* teaches that at least when the state creates a system permitting private parties to substitute their judgment for that of a state official or body, a private actor's mere invocation of state power renders that party's conduct actionable under § 1983." 727 F.2d at 82.

In the present case, the only hint of joint action between defendants and the state originates from a Delaware statute authorizing commercial establishments to detain suspected shoplifters for a reasonable period for the purpose of calling the police. *See* Del. Code Ann. tit. 11 § 840(c). Yet, courts have found security officials acting pursuant to similar statutes were not state actors. *See Vassallo v. Clover,* 767 F.Supp. 651 (E.D.Pa. 1990); *Gipson v. Supermarkets Gen. Corp.,* 564 F.Supp. 50 (D.N.J.1983) (citing cases); *but see Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972 (8th Cir.1993). These courts rely on the basic premise of *Cruz* that state action will not be found in the absence of a substitution of the private actor's judgment for that of the police. Delaware's statute does not authorize a substitution of judgment; it merely permits stores to temporarily detain suspected shoplifters until the police can take charge at the scene. Therefore, defendants are not state actors and summary judgment will be granted for them with respect to plaintiff's section 1983 claims.

### III. State Law Claims

Having granted summary judgment for defendants on all Lewis' federal claims, the Court is left to consider whether, under 28 U.S.C. § 1367(c)(3), it should decline to decide Lewis' state law claims. Section 1367(c) allows a federal district court, in its discretion, to decline to exercise supplemental jurisdiction over state law claims when the court has dismissed all claims over which it had original jurisdiction. The Third Cir-

cuit Court of Appeals, finding section 1367(c) a codification of "preexisting pendent jurisdiction law," has opined, "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995).

The parties have not raised any considerations that would cause the Court to deviate from the general rule and instead exercise supplemental jurisdiction over Lewis' state law claims. In fact, Lewis concedes the Court should not exercise supplemental jurisdiction over her state law claims upon dismissal of her federal claims. D.I. 29, at 14 (*citing Heller v. CACL Federal Credit Union,* 775 F.Supp. 839 (E.D.Pa.1991)). Accordingly, supplemental jurisdiction will not be exercised and Lewis' state law claims will be dismissed.

An order will issue consistent with this opinion.