United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 00-3980

_____

Carl Youngblood                          *
                                         *
                    Appellant            *
                                         *    Appeal from the United States
        v.                               *    District Court for the
                                         *    Western District of Missouri
Hy-Vee Food Stores, Inc.                 *
                                         *
                    Appellee             *


_____

Submitted: June 15, 2001
Filed: September 17, 2001

_____


Before McMILLIAN and RICHARD S. ARNOLD, Circuit Judges, and DAWSON,[1]
District Judge.

DAWSON, District Judge.

        Carl Youngblood, an African-American, instituted a civil rights action against
Hy-Vee Food Stores, Inc. (Hy-Vee), asserting that Hy-Vee violated his rights under 42
U.S.C. §§ 1981 and 1983 and also subjected him to malicious prosecution and false
imprisonment when they detained him on suspicion of shoplifting and had him arrested

_____

        [1] The Honorable Robert T. Dawson, United States District Judge for the
Western District of Arkansas, sitting by designation.

and pressed charges against him. The district court[2] granted Hy-Vee summary judgment, concluding that Hy-Vee's actions did not deprive Youngblood of his right to contract under Section 1981, as Youngblood had completed his purchase; that Hy-Vee did not violate the full-and-equal-benefits clause of Section 1981, as its actions constituted private and not state action; that because Hy-Vee's actions did not constitute state action, Youngblood's Section 1983 claim likewise failed; and that Youngblood could not establish malicious prosecution or false imprisonment, as there was probable cause for his arrest and his detention was reasonable.

On appeal, Youngblood argues that the contract rights protected by Section 1981 include the right to the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, and that the district court therefore erred in concluding that Section 1981 provided Youngblood no protection once he completed the contract by making his purchase. Youngblood further argues that the full-and-equal-benefits clause of Section 1981 applies to private actors, and that, in any event, Hy-Vee acted under color of state law so as to implicate Youngblood's rights under both Sections 1981 and 1983. Finally, Youngblood argues that probable cause did not exist to arrest him and thus, summary judgment was inappropriate on his malicious-prosecution and false-imprisonment claims.

For reasons stated herein, we AFFIRM the decision of the district court.

## I.    Background.

On or about April 13, 1998, Youngblood entered Hy-Vee and proceeded to the section of the store that contained canisters of beef jerky. Youngblood spent some time in this area before selecting a canister and walking up the aisle towards the check-out

---

[2] The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

area.  A store employee observed Youngblood and thought his behavior unusual for it appeared to the employee that Youngblood had his hands underneath his shirt.  After taking a few steps up the aisle,  Youngblood  turned and returned to the beef-jerky section, placed the original canister back on the shelf and picked up another canister. It appeared to the store employee that Youngblood placed the second canister underneath his shirt.  Youngblood then proceeded to the cash register and purchased a single canister of beef jerky.   The store employee checked the canister Youngblood placed back on the shelf and discovered that most of the beef jerky inside was missing. As Youngblood headed toward the exit, the employee stopped Youngblood and asked for his receipt.  Youngblood gave him the receipt and his bag.  The store employee opened the canister Youngblood had purchased and observed that it was "crammed full" of beef jerky.  The stop of Youngblood in the front of the store lasted two to five minutes and Youngblood then waited in an upstairs office for approximately twenty minutes until the police arrived. The door to the office remained open during this time and Youngblood was not physically restrained in any manner. When the police officer arrived, he asked what Youngblood had done and the store employee told the officer that Youngblood had taken most of the contents of one beef-jerky canister and placed it into another.  After examining the contents of the canister, the officer arrested Youngblood.  The criminal charges against Youngblood were ultimately dismissed.

## II.    Discussion.

We review the district court's grant of  summary judgment de novo. *See Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001).  We reverse an award of summary judgment only if we find that a material issue of fact exists or that the district court made an incorrect conclusion of law.  *See* Fed. R. Civ. P. 56(c).  In deciding whether Hy-Vee is entitled to summary judgment, we view the summary judgment record in

3

a light most favorable to Youngblood, affording him the benefit of all reasonable inferences. *See Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001).

## A.      Section 1981's Right-to-Contract Clause

Section 1981 provides that all persons shall have the same right to "make and enforce contracts." *See* 42 U.S.C. § 1981 (a). In 1991, Congress expanded the scope of Section 1981 to include the right to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *See* 42 U.S.C. § 1981 (b). Hy-Vee removed the beef jerky from Youngblood after the point of purchase and Hy-Vee did not refund Youngblood's money even after the charges against him were dismissed. Hy-Vee further did not return the beef jerky to Youngblood as Hy-Vee discards all damaged items associated with a suspected shoplifting. The question we must determine is whether any contractual relationship remained once Youngblood completed his purchase and if the taking of the beef jerky denied Youngblood a benefit of the contractual relationship.

While there is scant precedent, courts that have addressed the issue have concluded that once the purchase is completed, no contractual relationship remains. *See e.g.*, *Lewis v. J. C. Penney Co. Inc.*, 948 F. Supp. 367, 372 (D. Del. 1996); *see also Rogers v. Elliott*, 135 F. Supp.2d 1312, 1315 (N.D. Ga. 2001). Youngblood correctly points out that in these cases the customers did not have the merchandise they purchased taken away. This distinction is of little significance, however, as the key is whether any contractual duty remained after Youngblood made his purchase. Once Youngblood paid the cashier and received the beef jerky from the cashier, neither party owed the other any duty under the retail-sale contract. This case is distinguishable from *Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091 (10th Cir. 2001), where the Tenth Circuit found a contractual relationship existed after the purchase. In *Hampton*, the customer received a coupon for a fragrance sample as a benefit of her purchase and the Tenth Circuit concluded that the store had a contractual duty to allow the customer

4

to redeem the coupon. *See id.* at 1103-05. In this case, nothing that happened after the sale created any further contractual duty on Hy-Vee's part. Accordingly, Hy-Vee cannot be said to have deprived Youngblood of the benefit of any contractual relationship, as no such relationship existed when it took the beef jerky away from Youngblood.

The dissent suggests that Youngblood was blatantly discriminated against in this case. While we disagree, Section 1981 does not provide a general cause of action for race discrimination if in fact it occurred. The requirement remains that a plaintiff must point to some contractual relationship in order to bring a claim under Section 1981. This conclusion does not mean that there is no remedy in cases where a store wrongfully confiscates items purchased by a customer. The nature of the action, however, is not in contract, but in tort. Specifically, under Missouri law, a cause of action for conversion lies for the tortious taking of a chattel. *See Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 415 (Mo. Ct. App. 2000).

## B.     Section 1981's Full-and-Equal-Benefit Clause

Section 1981 provides that all persons shall have the right to "the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a). "Because the state is the sole source of the law, it is only the state that can deny the full and equal benefit of the law." *Chapman v. Higbee Co.*, 2001 WL 753504, *3 (6th Cir. July 5, 2001); *see also Mahone v. Waddle*, 564 F.2d 1018, 1029 (3d Cir. 1977) (concept of state action is implicit in full-and-equal-benefit clause), *cert. denied*, 438 U.S. 904 (1978). As discussed below, Hy-Vee's actions did not constitute state action and Hy-Vee was therefore entitled to summary judgment on Youngblood's claim under the full-and-equal-benefit clause.

5

### C.    Section 1983

Only state actors can be held liable under Section 1983. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970).  A private party who willfully participates in joint activity with the State or its agents is considered a state actor.  *See id.* at 152.  A store may be considered to be acting jointly with police when the police detain accused shoplifters without making an independent investigation or pursuant to a customary plan between the store and the police department.  *See Murray v. Wal-Mart, Inc.*, 874 F.2d 555, 558-59 (8th Cir. 1989).  In *Murray*, the court found that Wal-Mart acted in concert with the police because Wal-Mart had a practice of working with the police department in prosecuting shoplifters; the store security guard was an employee of the police department; and the police relied on the guard's incomplete version of the facts without any independent investigation.  *See id.* at 559.

The present case is distinguishable from *Murray*, as the store employee who witnessed the incident was not employed by the police department and the police officer summoned to the scene investigated the incident by speaking with the store employee and examining the contents of the beef jerky canister.  Youngblood relies on a state statute which authorizes merchants to detain suspected shoplifters in a reasonable manner and for a reasonable length of time to investigate whether there has been a shoplifting, *see* Mo. Rev.  Stat. § 537.125 (2000), and argues that as Hy-Vee acted under this statute, its conduct constituted state action.  The Supreme Court has held that a private party's mere invocation of state legal procedures does not  constitute state action. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 n.21 (1982); *cited in Miller v. Compton*, 122 F.3d 1094, 1098 (8th Cir. 1997).

### D.    State-Law Claims of Malicious Prosecution and False Imprisonment

The district court properly granted Hy-Vee summary judgment on these claims, as probable cause existed to suspect Youngblood of shoplifting.  *See Jacobs v. Bonser*,

46 S.W.3d 41, 49 (Mo. Ct. App. 2001) (to make submissible case of malicious prosecution, plaintiff must show lack of probable cause for prosecution); *Edwards v. McNeill*, 894 S.W.2d 678, 683 (Mo. Ct. App. 1995) (probable cause is complete defense to cause of action for false arrest). A store employee thought he observed Youngblood put a canister of beef jerky under his shirt, then return that canister to the shelf and place another one under his shirt. The employee examined the can placed back on the shelf and only a couple of pieces remained in it. When the employee examined the canister Youngblood had purchased, it appeared to be "crammed full." These facts provided "reasonable grounds for suspicion, supported by circumstances . . . sufficiently strong to warrant a cautious man in his belief" that Youngblood had committed the offense of shoplifting. *See Thompson v. Wal-Mart, Inc.*, 890 S.W.2d 780, 782 (Mo. Ct. App. 1995).

### III.    Conclusion.

Based on the foregoing, we hereby affirm the district court's rulings in their entirety.

RICHARD S. ARNOLD, Circuit Judge, dissenting.

Under 42 U.S.C. § 1981, all persons in the United States have the same right "to make and enforce contracts." 42 U.S.C. § 1981(a). In 1991, Congress amended the statute to explain that this clause includes the right to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b). Our job is to decide what rights are conferred by this statute.

The statute, in its entirety, reads as follows:

§ 1981.  Equal rights under the law

7

(a)     Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)     "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c)     Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

The Court holds in this case that a customer (Youngblood) who is detained by employees of a retail store (Hy-Vee) immediately after he has paid for a consumer item, who has that item taken from him by those employees, and who is not refunded the money with which he purchased the item—all of which events occur on the store premises—cannot maintain an action under § 1981 based on his right to enjoy the "benefits" of the contractual relationship." § 1981(b). The Court reasons that at the

time of these events, no contract existed between Youngblood and Hy-Vee because the retail sale had been concluded.[3]

Underlying the Court's reasoning is a narrow view of the scope of the contract right conferred by § 1981. There are several reasons to think that this view is too narrow, and that Congress actually conferred a more expansive right under the statute.

First, the language of the statute itself—particularly the detailed explanatory language of subsection (b)—is broad and inclusive. Subsections (b) and (c) of the statute are recent amendments that were enacted as part of the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071. By its terms, subsection (b) interprets § 1981's "make and enforce contracts" clause to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b). Moreover, the Act's statement of purposes explicitly describes the Act as "*expanding* the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." Civil Rights Act of 1991 § 3(4) (emphasis added). Therefore, as a matter of statutory construction, the "make and enforce contracts" clause is to be interpreted broadly.

Second, the legislative history of the recent amendments confirms what the statutory language implies—that Congress intended to broaden the scope of the

---

[1] In the Court's words, "[o]nce Youngblood paid the cashier and received the beef jerky from the cashier, neither party owed the other any duty under the retail-sale contract." *Ante*, at 4. As a result, the Court determines, "Hy-Vee cannot be said to have deprived Youngblood of the benefit of any contractual relationship, as no such relationship existed when it took the beef jerky away from Youngblood." *Id.* at 4-5. Instead of an action under § 1981, the Court suggests, Youngblood has a state-law action for conversion. *Id.* at 5.

9

contract right conferred by the statute. As the House Report to the Act indicates, "[t]he list set forth in subsection (b) is intended to be illustrative rather than exhaustive." H.R. Rep. No. 40(I), 102d Cong., 1st Sess. 92 (1991), reprinted in 1991 U.S. Code Cong. & Admin. News 549, 630. Moreover, Congress passed subsection (b) specifically in response to the Supreme Court's narrow construction of the "make and enforce contracts" clause in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298 (1994) (discussing amendment of § 1981). In *Patterson,* an employment discrimination case, the Court held that the clause did not provide employees with a cause of action for discrimination occurring after the formation of an employment contract. 491 U.S. at 171. The House Report demonstrates Congress's disagreement with such a limited reading of the statute. See H.R. Rep. No. 40(I), 102d Cong., 1st Sess. 92 (1991), reprinted in 1991 U.S. Code Cong. & Admin. News 549, 630 ("The Committee . . . finds that the Court's interpretation [in *Patterson*] of one of our most important federal civil rights laws [§ 1981] crippled the statute's deterrent value . . . . As a consequence, the Committee concludes that there is a compelling need for legislation to overrule the *Patterson* decision and ensure that federal law prohibits all race discrimination in all phases of the contractual relationship."). Accordingly, § 1981 now covers "all phases and incidents of the contractual relationship." *Rivers,* 511 U.S. at 302.

Third, civil rights legislation—such as § 1981, which is designed to address invidious racial discrimination—is generally interpreted broadly in keeping with its remedial purpose. It is written in general language with the understanding that courts have wide latitude in construing it to achieve the remedial purposes that Congress identifies. See, *e.g.*, *Patterson*, 491 U.S. at 171, 174 (reaffirming *Runyon v. McCrary*, 427 U.S. 160 (1976), and discussing "our society's deep commitment to the eradication of discrimination based on a person's race or the color of his or her skin"); *Bob Jones University v. United States*, 461 U.S. 574, 593 (1983) ("[E]very pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy

10

to prohibit racial segregation and discrimination."); see also *Brown v. Board of Education*, 347 U.S. 483 (1954); *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting) ("The law regards man as man, and takes no account of his . . . color when his civil rights as guaranteed by the supreme law of the land are involved"). Failing to construe § 1981 liberally could remove certain racially discriminatory conduct—conduct that Congress intended to prohibit—from the purview of the statute.

Fourth, what case law there is on § 1981 is not inconsistent with a broad reading of the statute. The particular question at issue—the scope of the contract right conferred by the statute in the context of a retail sales contract—has not appeared before in this circuit or elsewhere. None of the cases cited by the Court to the contrary is persuasive. In *Lewis v. J.C. Penney Co.*, 948 F. Supp. 367 (D. Del. 1996), the plaintiff was stopped and questioned by a security guard, but was permitted to leave with her purchase following the inquiry. *Id.* at 369-70. The court noted that the result might have been different (in fact, had been different in an earlier case) had there been a policy of treating customers differently based on race. In *Rogers v. Elliot*, 135 F. Supp. 2d 1312 (N.D. Ga. 2001), the plaintiffs were harassed by an individual cashier in a Wal-Mart store after making their purchase (which they kept), and there is no indication that any discriminatory intent existed on the part of anyone other than the cashier. *Id.* at 1313. Finally, in *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091 (10th Cir. 2001), the court allowed the § 1981 claim to proceed, recognizing that the plaintiff's ability to redeem a coupon given to her when she made her purchase was a benefit of the sales contract. *Id.* at 1103-05.

There is evidence of racial discrimination in this case. The District Court determined that Youngblood had produced enough evidence to show Hy-Vee's discriminatory intent, *Youngblood v. Hy-Vee Food Stores, Inc.*, No. 99-0629-CV-W-2-ECF, slip op. at 24 (W.D. Mo. Dec. 15, 2000), and statements in the record confirm

11

this determination. Regarding Hy-Vee's practices, there is evidence from several former store employees that Hy-Vee had a discriminatory pattern and practice of targeting, surveilling, stopping, and prosecuting black customers disproportionately to white customers. See Appellant's Appendix at 704, 709-10, 713-14.

Regarding the incident itself, Youngblood states that while he was being detained upstairs in the store, he was prevented from making a telephone call, and Hy-Vee employees were laughing and smirking. *Id.* at 429, 430. When he suggested that there was nothing funny about the situation, a Hy-Vee manager said: "I see a whole lot funny about it." *Id.* at 429. When Youngblood asked for his money back, he was told by the manager: "You and your people have to pay back double the amount." *Id.* at 430.

Given this background, I conclude that Hy-Vee's alleged actions come within § 1981, and that Youngblood should be allowed to proceed with his suit. A person's right to leave a store where he has purchased an item without being surrounded, detained, and having the item removed from his possession (and his money not returned) can easily be understood as a "benefit" of the contract. *Cf. Perry v. Burger King Corp.*, 924 F. Supp. 548, 552 (S.D.N.Y. 1996) (denying motion to dismiss where customer finished and paid for meal and sought to use restaurant's restroom; noting that plaintiff may be "considered to have contracted for food *and* use of the bathroom" as benefit of contractual relationship).

Accepting Youngblood's version of the facts (which we must for present purposes) racial discrimination pervaded the entire contracting process, not just the moment that Youngblood exchanged money for beef jerky. Youngblood was singled out for surveillance by the store clerk before he made his purchase, singled out for suspicion as he walked to the register to make his purchase (when the store clerk alerted the manager), and singled out for detention by three store employees as he tried

12

to leave the store with his purchase. In short, the entire contracting process—from the time Youngblood entered the store until the time he was prevented from leaving with the beef jerky he had paid for—was tinged with racial discrimination, if Youngblood's evidence is believed. Given § 1981's remedial purpose, whether Youngblood had been detained and the beef jerky seized prior to his paying for it, as he was paying for it, or as he was heading for the exit with it should not make a difference under § 1981.

Finally, it is important to separate the question of guilt and innocence from the question of whether a civil rights violation has occurred. In this case, we are not presented with the question of Youngblood's guilt or innocence of shoplifting. (The criminal case against him was dismissed.) Rather, we are faced with determining when victims of racial discrimination can bring suit under § 1981. The statute protects the guilty as well as the innocent from racially discriminatory practices. Thus, while it is certainly the case that the innocent should not be singled out for arrest because of their skin color, it is equally the case that the guilty should not be singled out for suspicion, investigation, and arrest simply because of their skin color.

For these reasons, I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

13