Nigel S. PHILLIP, Bernard Schmidt, St. Patrick Reid, and Grant Gittens, Plaintiffs–Appellants,

v.

UNIVERSITY OF ROCHESTER, Raymond Pipitone, and James Clukey, Defendants–Appellees.

Docket No. 01–7582.

United States Court of Appeals, Second Circuit.

Argued: April 10, 2002.

Decided: Jan. 21, 2003.

Jeffrey Wicks, Bansbach, Zoghlin, Wicks & Wahl, P.C., Rochester, NY, for Plaintiffs–Appellants.

Thomas E. Reidy, Ward Norris Heller & Reidy, LLP, Rochester, NY, for Defendant–Appellee University of Rochester.

Christopher A. DiPasquale, Harris Beach LLP, Pittsford, NY, for Defendants–Appellees Raymond Pipitone and James Clukey.

Before: McLAUGHLIN, POOLER, and B.D. PARKER, Jr., Circuit Judges.

POOLER, Circuit Judge.

We are asked to decide whether the equal benefit clause of 42 U.S.C. § 1981 requires a showing of state action. Based primarily on the clear language of the statute, we hold that plaintiffs may sustain a claim for breach of the equal benefit clause without making a traditional state action showing. We caution, however, that this same statutory language constrains the breadth of the equal benefit clause. That is, plaintiffs must demonstrate that defendants, motivated by racial animosity, deprived or attempted to deprive plaintiffs of "the full and equal benefit" of a law or proceeding "for the security of persons and property." 42 U.S.C. § 1981(a).

## BACKGROUND

Nigel S. Phillip, Bernard Schmidt, St. Patrick Reid, and Grant Gittens are African–Americans and were, at the time of the pertinent events, students at the University of Rochester, a private university. In the early morning of April 30, 1999, the plaintiffs and other students, most of whom were minorities, gathered to socialize in the lobby of the university library.[1] Within minutes, James Clukey, a university security officer, came up to the students and told them to "break it up" and "take it outside." Although the students attempted to comply with Clukey's order, he de-

---

1. Because defendants moved to dismiss the complaint as facially inadequate, we accept the factual allegations of the complaint as true.

manded that Gittens show his university identification and asked the other individuals whether they were students at the university. One of the students, Elizabeth Pena, reached into Gittens' pocket, pulled out his university identification and said, "there, you see he's a student here. We are all students here." Clukey snatched Gittens' identification card and radioed the Rochester Police Department ("RPD") for assistance. The officer also followed the students outside. Soon afterwards Raymond Pipitone, a university security supervisor, came to the scene along with other security officers.

Phillip tried to end the confrontation by bringing Gittens to a friend's car. Just as the car was about to leave the parking lot, Clukey placed himself in front of the car, would not allow it to leave, and began to copy its license plate.

Several police units then arrived. Police officers arrested the four plaintiffs, apparently based on conduct that the officers had observed. The plaintiffs stayed in jail overnight but received adjournments in contemplation of dismissal the following morning. Charges against all plaintiffs have been dismissed.

On May 11, 1999, University of Rochester President Thomas H. Jackson sent a memorandum to the entire university community. In his letter, Jackson acknowledged that the plaintiffs believed they had been "dealt with in a racist manner." He also admitted that "the performance of two of the University's Security personnel varied somewhat from normal policies and procedures, and their judgment did not meet expectations in this case." Finally, Jackson promised to request that the charges against the plaintiffs be dismissed.

Plaintiffs sued the university, Pipitone, and Clukey, claiming false arrest and imprisonment, battery and excessive use of force, assault, malicious prosecution, intentional and negligent infliction of emotional distress, and violation of the equal benefit clause of Section 1981. Defendants moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss several of these claims including the Section 1981 claim. The district court dismissed plaintiffs' Section 1981 claim along with several of their other claims. With respect to the Section 1981 equal benefit clause claim, the court found plaintiffs could not prevail because they failed to allege state action. The parties subsequently stipulated to the dismissal of all remaining claims, and plaintiffs pursued this appeal, which is limited to the Section 1981 claim.

On appeal, plaintiffs contend that the district court's state action ruling was error. In addition to defending the district court's ruling, defendants contend that plaintiffs insufficiently pleaded racial motivation.

## DISCUSSION

### I. Standard of review

We review de novo the district court's Rule 12(b)(6) dismissal of plaintiffs' complaint. *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 619 (2d Cir.1999). We will affirm a dismissal on the face of the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 47, 78 S.Ct. 99 (quoted in *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). The federal rules allow simple pleadings and "rel[y] on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. 992. These liberal pleading

rules apply with particular stringency to complaints of civil rights violations. *Vital,* 168 F.3d at 619.

## II. Section 1981 and state action

To assess the need for state action in a Section 1981 equal benefit claim, we begin with the language of the statute both in its original form and as amended in 1991.

Before November 1991, Section 1981 provided only that

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

In 1991, Congress enacted amendments to Section 1981. The text just quoted now is denominated as subsection (a). A new subsection (b) repudiates *Patterson v. Mc-Lean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), in which the Supreme Court held that breaches of contract are outside the scope of the "make and enforce contracts" clause of Section 1981. And, pertinent to this appeal, a new subsection (c) provides: "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

 On the face of the amended statute, it would seem that the answer to the ques-

tion this appeal presents is clear: No state action is required for a Section 1981 claim.

Despite the apparent clarity of the statutory language, the courts of appeals to have considered whether the amended statute requires state action for an equal benefit clause claim have answered yes. *Youngblood v. Hy–Vee Food Stores, Inc.,* 266 F.3d 851, 855 (8th Cir.2001), *cert. denied,* 535 U.S. 1017, 122 S.Ct. 1606, 152 L.Ed.2d 621 (2002); *Brown v. Philip Morris Inc.,* 250 F.3d 789, 799 (3d Cir.2001).[2] The *Youngblood* holding rests on *Chapman v. Higbee Co.,* 256 F.3d 416 (6th Cir.2001), an opinion that since has been vacated and scheduled for rehearing en banc, 270 F.3d 297 (6th Cir.2001), and on dicta in *Mahone v. Waddle,* 564 F.2d 1018, 1029 (3d Cir.1977), a pre-amendment case. *Brown* relies on *Mahone* and various district court cases. As we explain, we do not find Youngblood, Brown, or their sources sufficiently persuasive to displace the clear words of the statute.

*Mahone,* the primary and largely unexamined source for the holdings in *Youngblood* and *Brown,* merits close examination. In *Mahone,* the Third Circuit held that police officers who physically and verbally abused African–Americans, falsely arrested them, and gave false testimony against them could be sued under Section 1981's equal benefit clause. *Mahone,* 564 F.2d at 1028–29. In response to defendants' argument that construing Section 1981 to encompass their actions would federalize tort law, the court said in dicta that there was no such danger because the equal benefit clause requires state action. *Id.* at 1029. Although the court acknowledged that the "make and enforce con-

**2.** We declared in *Yusuf v. Vassar Coll.,* 35 F.3d 709, 714 (2d Cir.1994), that Section 1981's "prohibitions apply to private as well as state actors, including independent academic institutions." However, we cannot be certain whether *Yusuf* controls here because

it does not indicate which clause of Section 1981 Yusuf raised and, at the time, it was clearly established that private actors could violate the contracts clause. *Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

tracts" clause of Section 1981 does not require state action, *id.* at 1029 (citing *Johnson v. Ry. Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), and *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976)), it said that the rights to "make and enforce contracts" and to enjoy the "full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" were so different that the *Johnson* and *Runyon* holdings have no application to an equal benefit clause claim. *Id.* Because it is individuals who ordinarily make contracts, the court reasoned that individuals should be held liable for the racially motivated infringement of the contracts they make. *Id.* In contrast, the court said that the equal benefit clause "suggest[s] a concern with relations between the individual and the state, not between two individuals" because states, not individuals, make laws and only the state can take away the protection of the laws it created. *Id.*

Because we do not agree with the premise of *Mahone,* we do not find its logic persuasive. Although the phrasing of the equal benefit clause does suggest that there must be some nexus between a claim and the state or its activities, the state is not the only actor that can deprive an individual of the benefit of laws or proceedings for the security of persons or property.

Having determined that individuals can deprive others of the equal benefit of laws and proceedings designed to protect the personal freedoms and property rights of the citizenry, we see no principled basis for holding that state action is required for equal benefit clause claims but not for contract clause claims. We therefore reject the analysis in *Mahone.* Nor does *Runyon* suggest a principled basis for limiting to the contract clause its conclusion that no state action is required under Sec-

tion 1981. Although *Runyon* involved a contract clause claim, the Court held simply that "42 U.S.C. § 1981 ... reaches purely private acts of racial discrimination." *Runyon,* 427 U.S. at 170, 96 S.Ct. 2586.

Finally, *Mahone* does not take into account the legislative history of the original version of Section 1981. This history suggests legislators' concern over private acts motivated by racial discrimination. Early on in its consideration of the bill that eventually became Section 1981, Congress considered a letter whose writer reported that "[t]he hatred toward the negro as a freeman is intense among the low and brutal, who are the vast majority. Murders, shooting, whippings, robbing, and brutal treatment of every kind are daily inflicted upon them." Cong. Globe, 39th Cong., 1st Sess. 94 (1865). Another writer reported that an average of one black man was killed every day. *Id.* at 95. On January 22, 1866, Senator Creswell reported claims from two of his constituents that returning rebel soldiers persecuted, beat, and sometimes killed Negro soldiers who had fought for the Union. Cong. Globe, 39th Cong., 1st Sess. 339 (1866).

On January 29, 1866, Senator Trumbull, who sponsored the legislation, identified the rights protected by the Act as "fundamental rights." *Id.* at 476. Quoting *Corfield v. Coryell,* 4 Washington's Circuit Court Reports 380, Senator Trumbull identified these fundamental rights as

"protection by the Government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind; and to pursue and obtain happiness and safety, subject, nevertheless to such restraints as the Government may justly prescribe for the general good of the whole[;][t]he right...to pass through, or to reside in any other State; ... to claim the benefit of the

writ of *habeas corpus;* to institute and maintain actions of any kind in the courts of the State; to take, hold, and dispose of property, either real or personal, and an exemption from higher taxes or impositions than are paid by the other citizens of the State."

*Id.* at 475. "As to these basic civil rights," ... Senator [Trumbull] said, the bill would " 'break down *all* discrimination between black men and white men.' " *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 432, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (quoting Cong. Globe, 39th Cong., 1st Sess. 599).

Throughout the legislative history, reports of abuses like those quoted above often are followed by statements suggesting that the writer was concerned about the freedmen's inability to obtain redress in southern courts. *See, e.g.,* Cong. Globe, 39th Cong., 1st Sess. at 94. However, the extensive description of racial abuses that individuals perpetrated, coupled with the Senate sponsor's broad view of the legislation's aims, persuades us that we should read Section 1981 as broadly as is consistent with the actual language of each clause. *Cf. Jones,* 392 U.S. at 426–37, 88 S.Ct. 2186 (construing Section 1981's sibling statute, 42 U.S.C. § 1982).

Based on the general language of *Runyon,* the original legislative history, and *Mahone*'s key analytical flaw—finding that individuals could not deny one another the equal benefit of a law or proceeding, we suspect that the Third Circuit erred by finding state action necessary to support a Section 1981 equal benefit clause claim.

Even assuming that the Third Circuit correctly decided *Mahone,* we believe that the 1991 amendment removes any doubt that the conduct of private actors is actionable under the equal benefit clause of Section 1981. Thus, we respectfully differ with the contrary conclusion reached by the Eighth and Third Circuits. As we

discussed previously, these circuits primarily relied on *Mahone* and *Chapman. Youngblood,* 266 F.3d at 855; *Brown,* 250 F.3d at 799. We already have explained why we find *Mahone* unpersuasive. And, Section 1981(c) places *Mahone*'s continuing viability in even greater doubt. Because the *Chapman* majority's arguments coincide with defendants' arguments and were adopted by reference in *Youngblood,* we consider their validity even though *Chapman* itself no longer has precedential force in the Sixth Circuit.

Unlike Mahone, *Brown,* and *Youngblood,* Chapman contains a lengthy analysis of the state action issue. The *Chapman* majority first accepted *Mahone*'s conclusion that only the state can take away the benefits of laws and proceedings because only the state creates these laws and proceedings. *Chapman,* 256 F.3d at 420–21. It then parsed subsection (c), finding that it was

> properly understood as clarifying the nature of the various "rights" enumerated in subsection (a). That is, the "rights ... protected against impairment by nongovernmental discrimination" applies to the "make and enforce contracts" clause, while the "rights ... protected against ... impairment under color of State law" refers to such clauses as the "full and equal benefit" clause of subsection (a).

*Id.* at 421. The court also held that a contrary interpretation would have "the absurd result of federalizing state tort law." *Id.* Finally, the court relied on the legislative history for subsection (c). This history states in its entirety:

> This subsection is intended to codify *Runyon v. McCrary.* In *Runyon,* the Court held that Section 1981 prohibited intentional racial discrimination in private, as well as public, contracting. The Committee intends to prohibit racial dis-

crimination in all contracts, both public and private.

H. Rep. No. 40, 102d Cong., 1st Sess., Pt. II at 37 (1991), reprinted in U.S.Code Cong. & Admin. News at 549, 731.

In our view, each of *Chapman*'s supporting arguments lacks merit. As we discussed in our consideration of *Mahone*, we reject the proposition that only the state can deprive an individual of the full and equal benefit of laws for the security of persons or property. We also do not believe that the *Chapman* panel's construction of subsection (c) is sustainable given the language of that subsection, which is, "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). In effect, the *Chapman* majority substituted for those clear words, the statement that "some of the rights protected by this section are protected against impairment by nongovernmental discrimination and others are protected against impairment under color of state law." The *Chapman* majority then decided that the rights protected against private interference were those within the contract clause while other rights—including those contained in the equal benefit clause—were protected only against state interference. If Congress had intended this result, it would have used language specifying which rights were protected against private interference, which against state interference, and which against both. The current language of subsection (c), however, can only be read to protect all of subsection (a)'s rights against both governmental and private interference.

Not only does *Chapman*'s interpretation distort the language of the clause, but it also fails on its own terms. It was clearly established prior to the 1991 amendment that Section 1981's contracts clause protects against violations by both state and private actors. *Patterson*, 491 U.S. at 171, 109 S.Ct. 2363. Thus, the artificial dichotomy that the *Chapman* panel perceived does not exist, and its interpretation makes subsection (c) superfluous.

■ In view of the clarity of Section 1981(c), *Chapman's* resort to legislative history was ill advised. If a statute is clear on its face, a court is not permitted to use other interpretive tools, including legislative history, to discern the statute's meaning. *See, e.g., In re Venture Mortgage Fund, L.P.,* 282 F.3d 185, 188 (2d Cir.2002). In any event, the legislative history's reference to *Runyon v. McCrary* is consistent with our view of subsection (c) because, as noted previously, the language in that opinion does not limit its holding to the contracts clause. *Runyon,* 427 U.S. at 170, 96 S.Ct. 2586.

■ For several reasons, we also decline defendants' invitation to modify the clear language of subsection (c) to avert a hypothesized federalization of tort law. First, we question our authority to do so. Second, neither the language of the statute nor the legislative history of the pre-amendment statute evinces a congressional purpose to preclude a wide federal role in protecting civil rights. Subsection (c), on its face, protects against both governmental and private interference with subsection (a) rights. The legislative history also suggests a broad goal of eliminating discrimination, whether private or public, between blacks and whites in areas affecting basic rights. Third, it is inconsistent to condemn the federalization of tort law when both Congress and the Supreme Court have made clear that Section 1981 reaches all contracts. *See Patterson,* 491 U.S. at 175, 109 S.Ct. 2363; 42 U.S.C. § 1981(c). Because both contracts and torts are areas of particular state concern, there is no persuasive reason why racially

motivated torts that deprive a plaintiff of the equal benefit of laws or proceedings for the security of persons and property should be outside the ambit of federal authority while racially motivated breaches of contract are not. Finally, we believe that any necessary safeguard against overuse of the equal benefit clause's protections is found in the words of the statute. Prospective plaintiffs first must prove a racial animus, not an easy task in itself; second must identify a relevant law or proceeding for the "security of persons and property;" and finally must persuade a fact-finder or the court that defendants have deprived them of "the full and equal benefit" of this law or proceeding. 42 U.S.C. § 1981(a).

■ We do not here attempt to define the universe of laws and proceedings for the security of persons and property, believing this task best resolved case by case. However, we do hold that plaintiffs here adequately alleged a deprivation of a law or proceeding for the security of persons and property. Accepting the truth of plaintiffs' allegations and according those allegations the most generous interpretation they support, defendants refused to allow Gittens and his friends to leave an area where they were peacefully assembled, confiscated Gittens' identification, and then called the police. We also accept the plausible inference that the police were called either to criminally investigate plaintiffs' behavior or to restore peace. We have no difficulty categorizing either a criminal investigation or the restoration of peace as a "proceeding for the security of persons and property" at the Rule 12(b)(6) stage. A full record and an adequately supported summary judgment motion may establish that the defendants' actions cannot be characterized as depriving plaintiffs of the equal benefit of proceedings for the security of persons and property. But at this stage, we address only the propriety of the district court's Rule 12(b)(6) deci-

sion. We hold that, assuming that Section 1981 requires a nexus to state proceedings or laws but not state action, plaintiffs' allegations are sufficient because plaintiffs claim that defendants attempted to trigger a legal proceeding against plaintiffs but would not have taken the same action had white students engaged in the same conduct.

### III. Racial animus

■ Defendants argue in the alternative that we should affirm the district court's judgment based on plaintiffs' failure to adequately plead racial animus. It is true that plaintiffs plead few facts relevant to discriminatory intent. Nevertheless, we believe that their allegations are sufficient under the liberal standards applicable to Rule 12(b)(6) motions. Plaintiffs allege that they are African–Americans, describe defendants' actions in detail, and allege that defendants selected them for maltreatment "solely because of their color." A recent Supreme Court case, *Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), compels us to conclude that these allegations are sufficient. In *Swierkiewicz*, the Court held that a Title VII plaintiff need not set forth circumstances supporting an inference of discrimination in order to survive a Rule 12(b)(6) motion. *Id.* at 512–13, 122 S.Ct. 992. The Court found sufficient plaintiff's detailed account of the events leading up to his termination, which included the ages and nationalities of some of the decision makers, and his claim that his termination was motivated by age and national origin. *Id.* at 514, 122 S.Ct. 992. The Court said that these allegations "g[a]ve respondent fair notice of what petitioner's claims are and the grounds upon which they rest." *Id.* Like the *Swierkiewicz* complaint, the complaint here describes in great detail what the defendants actually did—actions that included confiscating without cause

one plaintiff's identification, refusing to allow the plaintiffs to leave an area where they were peaceably assembled, and calling law enforcement officers without any misconduct on the students' part. In addition, although the complaint, like the complaint in *Swierkiewicz*, does not contain many evidentiary allegations relevant to intent, it does allege that the plaintiffs were singled out of a group that apparently also contained non-minority students. Based on *Swierkiewicz*, we find the allegations in plaintiffs' complaint sufficient to survive a Rule 12(b)(6) motion. This determination, of course, does not preclude a contrary determination on an appropriately supported summary judgment motion.

## CONCLUSION

We hold that the equal benefit clause of Section 1981(a) does not require state action. We also find that plaintiffs' allegations state a claim that defendants, who were motivated by racial discrimination, attempted to deprive them of the "full and equal benefit" of a state proceeding "for the security of persons and property." Therefore, we vacate and remand. We emphasize that our holding is limited to the facts before us, and we intimate no view of the appropriate outcome for factual allegations less directly linked to "laws [or] proceedings for the security of persons and property."