RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0048P (6th Cir.)
File Name: 03a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LYNETTE CHAPMAN,
      *Plaintiff-Appellant,*

      *v.*

THE HIGBEE COMPANY, d/b/a
DILLARD DEPARTMENT
STORES, INC.,
      *Defendant-Appellee.*

No. 99-3970

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00423—Patricia A. Hemann, Magistrate Judge.

Argued: March 20, 2002

Decided and Filed: February 11, 2003

Before: MARTIN, Chief Circuit Judge; BOGGS,
SUHRHEINRICH, BATCHELDER, DAUGHTREY,
MOORE, COLE, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** David R. Grant, SMITH & CONDENI,
Cleveland, Ohio, for Appellant. John B. Lewis, BAKER &
HOSTETLER, Cleveland, Ohio, for Appellee. **ON BRIEF:**

1

David R. Grant, SMITH & CONDENI, Cleveland, Ohio, for Appellant.  John B. Lewis, Thomas J. Piatak, BAKER & HOSTETLER, Cleveland, Ohio, for Appellee.  Gino J. Scarselli, Cleveland, Ohio, Michael W. Donaldson, Thomas M. Tarpy, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Amici Curiae.

MARTIN, C. J., delivered the opinion of the court, in which DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, JJ., joined.  SUHRHEINRICH, J. (pp. 16-29), delivered a separate dissenting opinion, in which BOGGS and BATCHELDER, JJ., joined.

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Chief Circuit Judge.  Lynette Chapman brought suit against the Higbee Company, doing business as Dillard's Department Store, after a Dillard's security officer stopped and searched her.  Chapman alleges that the stop and search were racially motivated and violated her right to the "full and equal benefit of the law" under 42 U.S.C. § 1981 and her right to be free from unreasonable search and seizure under the Fourth Amendment.  Her claim raises two issues on appeal: (1) whether section 1981 provides a cause of action against a private party under its equal benefit clause and (2) whether the Dillard's security officer acted "under color of law."  The court below found that section 1981 does not protect against private impairment of its equal benefit clause and that the security officer did not act "under color of law."  A divided panel of this court affirmed.  After rehearing *en banc*, we REVERSE.

I.

On February 20, 1997, Chapman, an African-American, was shopping at Dillard's Department Store in Cleveland, Ohio.  After choosing some clothing, Chapman entered a fitting room, from which a Caucasian woman had just exited.

When Chapman entered the fitting room, she noticed a sensor tag called a "kno-go" on the floor. After trying on the clothing, Chapman decided not to purchase anything and left the fitting room to return the clothing to the racks.

A Dillard's sales assistant noticed the sensor on the floor of Chapman's fitting room and, suspecting Chapman of shoplifting, notified a Dillard's security officer. The officer, an off-duty sheriff's deputy, was wearing his official sheriff's department uniform, badge, and sidearm. As an employee of Dillard's, the security officer was obligated to obey Dillard's Rules and Procedures for Security Personnel, which provide the following instructions with respect to strip searching customers suspected of shoplifting: "Strip searches are prohibited. If you suspect that stolen objects are hidden on [the shopper's] person, call the police."

The security officer stopped Chapman and directed her back to the fitting room. He and a female manager then searched Chapman's purse. After determining Chapman's purse contained no Dillard's merchandise, the officer informed Chapman that it would also be necessary to check her clothes. At the officer's behest, Chapman accompanied the female manager into the fitting room. The manager then searched Chapman by having Chapman remove her coat and suit jacket and lift up her shirt. After the manager found nothing, she apologized, and Chapman left the store.

As a result of this incident, Chapman brought suit against Dillard's, seeking relief (1) under 42 U.S.C. § 1981 for impairment of her rights under that statute's equal benefit clause and (2) under 42 U.S.C. § 1983 for violations of her right to be free from unreasonable search and seizure under the Fourth Amendment and her right to due process under the Fifth Amendment. A magistrate judge, sitting by the parties' consent, granted summary judgment in favor of Dillard's, finding (1) Chapman could not state a cognizable claim under section 1981 because the statute does not protect against private impairment of its equal benefit clause and (2) Chapman could not state a cognizable claim under section

1983 because the security officer was not acting "under color of state law." After the magistrate denied her motion for reconsideration, Chapman appealed. A divided panel of this court affirmed, and we granted *en banc* review.

## II.

We review *de novo* a district court's grant of summary judgment, viewing the evidence in the light most favorable to the non-moving party. *Grand Rapids Plastics, Inc. v. Lakian,* 188 F.3d 401, 405 (6th Cir. 1999). Summary judgment is appropriate only when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Aparicio v. Norfolk & Western Ry. Co.,* 84 F.3d 803, 807 (6th Cir. 1996) ("Without weighing the evidence or judging the credibility of witnesses, and drawing all inferences in favor of the non-moving party, a district court usually undertakes to determine whether there is sufficient evidence to permit reasonable jurors to find for the non-moving party.").

### A.

The viability of Chapman's section 1981 claim turns on whether section 1981 protects against private impairment of its equal benefit clause. In relevant part, section 1981 reads as follows:

(a) Statement of equal rights
*All persons within the jurisdiction of the United States shall have the same right in every State and Territory* to make and enforce contracts, to sue, be parties, give evidence, and *to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens*, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

* * * *

(c) Protection against impairment

---

not federalization of tort law, I do not know what is. *See Spencer*, 839 F. Supp. at 1019 ("Reading the clause to encompass this kind of conduct, however, risks creating a section 1981 action whenever a white man strikes a black man in a barroom brawl. . . . Extending the 'equal benefit' clause to private conduct would have the effect of federalizing all racially-motivated state-law torts that implicate 'the security of persons and property.'"). As the Supreme Court stated in *Patterson*, "[a]lthough we must do so when Congress plainly directs, as a rule we should be . . . 'reluctant to federalize' matters traditionally covered by state common law." *Patterson*, 491 U.S. at 183 (quoting *Sante Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977)). As explained above, Congress did not plainly direct that § 1981 apply to state tort law (like it did for contracts). In its zeal to expand the scope of federal law, the majority has ignored *Patterson's* cautionary words.

## III.

In sum, I would hold that nongovernmental actors may not be sued under the equal benefit clause of 42 U.S.C. § 1981(a), which applies only to state action. Therefore, I would hold that Chapman failed to state a cognizable § 1981 claim because the alleged private discrimination she suffered is not within the purview of the equal benefit clause. I concur in the majority's analysis of Chapman's claim under 42 U.S.C. § 1983, because I believe there is a question of fact as to whether Dillard's may be considered a state actor under the nexus test.

For this reason, I respectfully **DISSENT** as to the § 1981 claim.

TORTS to understand that this "limitation" is not that because it encompasses, *inter alia,* all of tort law:

> Included under the head of torts are miscellaneous civil wrongs, ranging from simple, direct interferences with the person, such as assault, battery and false imprisonment, or with property, as in the case of trespass or conversion, up through various forms of negligence, to disturbances of intangible interests, such as those in good reputation, or in commercial or social advantage.
>
> . . .
>
> There remains a body of law whch [sic] is directed toward the compensation of individuals, rather than the public, for losses which they have suffered within the scope of their legally recognized interests generally, rather than one interest only, where the law considers that compensation is required. This is the law of torts.
>
> The law of torts, then, is concerned with the allocations of losses arising out of human activities; and since they cover a wide scope, so does this branch of law. Arising out of the various and ever-increasing clashes of the activities of persons living in a common society, carrying on business in competition with fellow members of that society, owning property whch [sic] may in any of a thousand ways affect the persons or property of others–in short, doing all the things that constitute modern living–there must of necessity be losses, injuries, of many kinds sustained as a result of the activities of others. The purpose of the law of torts is to adjust these losses, and to afford compensation for injuries sustained by one person as a result of the conduct of another.

PROSSER & KEETON ON THE LAW OF TORTS, § 1 (W. Page Keeton, *et. al.,* West Publishing Co. 5th ed. 1984).

Under the majority's interpretation, the equal benefit clause conceivably can be applied to every garden-variety state tort law claim where the parties are of different races. If this is

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.[1]

42 U.S.C. § 1981(a), (c) (1998) (emphasis added).

"In all cases of statutory construction, the starting point is the language employed by Congress." *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995). Moreover, where "the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Entertainment, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citation and internal punctuation omitted).

Section 1981 is unambiguous. According to subsection (c), the rights protected by section 1981 are "protected against impairment by nongovernmental discrimination." Section 1981 explicitly protects the right "to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens;" therefore, that right is "protected against impairment by nongovernmental discrimination."

1.

Dillard's argues that subsection (c)'s protection against nongovernmental discrimination is limited to subsection (a)'s make and enforce contracts provision.

Because subsection (c) already expressly limits its reach to those rights "protected by this section," the principle of *expressio unius est exclusio alterius* would seem to preclude this court from grafting additional limitations into the statute.

---

[1] In 1991, Congress amended 42 U.S.C. § 1981 by the addition, *inter alia*, of subsection (c), "to strengthen existing protections and remedies available under federal civil rights laws to provide more effective deterrence and adequate compensation for victims of discrimination." H.R.Rep. No. 102-40(II), at 1, *reprinted in* 1991 U.S.C.C.A.N. at 694.

We may, however, look past the plain language of a statute where: (1) the plain language creates inconsistencies within the statute itself, (2) application of the plain language runs contrary to clearly expressed legislative intent, or (3) application of the plain language would lead to absurd results. *Vergos v. Gregg's Enterprises, Inc.*, 159 F.3d 989, 990 (6th Cir. 1998) (citing *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)); *see also Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 56 L.Ed.2d 75 (1965) ("This Court, in interpreting the words of a statute, has some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results or would thwart the obvious purpose of the statute but it is otherwise where no such consequences would follow and where [a literal reading] appears to be consonant with the purposes of the Act.") (quoting *Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (internal citation and punctuation omitted)); *Crooks v. Harrelson*, 282 U.S. 55, 59-60, 51 S.Ct. 49, 75 L.Ed. 156 (1930).

2.

Relying on a Third Circuit decision authored before Congress added the language in subsection (c), *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir. 1977), Dillard's suggests that a plain reading of subsection (c) creates internal inconsistencies. In *Mahone*, the court held that a complaint against a city government for violation of section 1981's equal benefit clause stated a cognizable cause of action. Responding in dicta to the city's contention that the court's broad construction of section 1981 would give rise to a federal cause of action for every racially motivated private tort, the *Mahone* court suggested that such a result was unlikely, because "the concept of state action is implicit in the equal benefit clause." *Id.* at 1029-30. Adopting the *Mahone* court's dicta, Dillard's argues that a plain reading of subsection (c) is inconsistent with section 1981's equal benefit

Congress's intent in enacting subsection (c) could not have been any clearer. It intended to prohibit racial discrimination "in all contracts," because that is what is said, and only contracts, *because that is all it wrote.* The title of the amendment is also telling. *See generally I.N.S. v. Nat'l Center for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) (stating that "the title of a statute or section can aid in resolving an ambiguity in the legislation's text"). The Civil Rights Act of 1991 is entitled as follows: "Restoring Prohibition Against All Racial Discrimination *in the Making and Enforcement of Contracts.*" H.R. Rep. No. 102-40(II), at 35 (emphasis added).

In short, we can determine what Congress intended from what it told us and from what it did not tell us. I am not aware of, and the majority does not cite, any statutory canon which requires a court to read a positive right, "and x," unless the legislature expressly proclaims "and not x, " especially when "and x" is conceptually impossible. Contrary to what the majority says, that silence is not "equivocal." And it is certainly not a *tabula rasa* for courts to create rights.

4.

The majority's interpretation of subsection (c) with respect to the equal benefit clause also has the "absurd" result of federalizing state tort law. The majority opines that "it is unlikely that application of subsection (c)'s plain language will unleash the flood of cases Dillard's predicts . . . [because] [t]he language surrounding the 'full and equal benefit' clause serves to cabin both the number and nature of claims that may be brought under its ambit." *Maj. Op.*, at 9-10. That is, the majority believes that the right is sufficiently limited because the language "*for the security of persons and property* as is enjoyed by white citizens" limits the potential class of cases that may be brought under the equal benefit provision. One need look no further than the opening pages of PROSSER ON

---

§ 1981(b) (West 1994).

analytical framework, analogy to *Griffin* directs that private action would not be read into § 1981.

### 3.

The majority also claims that nothing in the legislative history of the 1991 amendments prevents this Court from applying subsection (c)'s plain language. Granted, Congress did not say that "by adding this subsection we mean that the equal benefit clause applies only to state and not private action." However, we can glean what the legislature intended from what it actually said:

> This section amends 42 U.S.C. § 1981 (commonly referred to as "Section 1981") to overturn *Patterson v. McLean Credit Union* and to codify *Runyon v. McCrary*, 427 U.S. 160, 96 S. Ct. 2586, . . . .
> Subsection (c) Prohibiting discrimination in private contracting.–This subsection is intended to codify *Runyon v. McCrary*. In *Runyon*, the Court held that Section 1981 prohibited intentional racial discrimination in private, as well as public, contracting. *The Committee intends to prohibit racial discrimination in all contracts,* both public and private.

H.R. Rep. No. 102-40(II), at 35, 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 731 (emphasis added).[3]

---

confers a right upon "[a]ll persons" and does not speak in terms of prohibiting private individuals from certain conduct.

[3] As stated, the amendment was in direct response to the Supreme Court's opinion in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). *Patterson* held that § 1981 prohibited discrimination only in the making and enforcement of contracts, and did not extend to problems arising from conditions of continuing employment. In the Civil Rights Act of 1991, Congress explicitly reversed this aspect of *Patterson* by adding subsection (b) to § 1981, which states that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C.A.

clause,[2] which implicitly incorporates the concept of state action.[2]

The Supreme Court's decision in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), however, precludes this court from finding subsection (c)'s plain language inconsistent with the statute's equal benefit provision. In *Griffin*, the Court found 42 U.S.C. § 1985(3)'s analogous equal protection provision applicable to private as well as official action. *Id.* at 96-102; *see also* 42 U.S.C. § 1985(3) (providing a cause of action where "two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws"). In so finding, the *Griffin* Court expressly rejected the notion that the concept of state action is implicit in an equal protection provision: "A century of Fourteenth Amendment adjudication has . . . made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons. Yet *there is nothing inherent in the phrase*

---

[2] Phrased differently, Dillard's argues that a plain reading of subsection (c) renders the statute internally inconsistent by protecting against private impairment rights that private actors cannot impair. Although not germane to Chapman's claim under section 1981's equal benefit clause, one could make a similar argument on the basis of subsection (a)'s like punishment clause. *See* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States . . . shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.").

There is nothing unworkable, however, about the proposition that a given statute may proscribe conduct beyond that which all of those persons the statute regulates are actually capable of engaging in. That the driver of an industrial dump-truck may be incapable of violating a seventy-five miles-per-hour speed limit does not preclude uniform application of that limit. Indeed, if a necessary component of statutory consistency was a regulated group capable of violating all of a statute's proscriptions, section 1981 could not be consistently read to apply to state actors, the vast majority of whom are in no position to punish, tax, or deny licenses to any person protected by section 1981.

*that requires the action working the deprivation to come from the State.*" *Id.* at 97 (emphasis added).

Indeed, *Griffin*'s interpretation of section 1985(3)'s equal protection provision suggests that section 1981's analogous clause would protect against private impairment even absent subsection (c)'s explicit instruction: "[T]he failure to mention any such [state action] requisite can be viewed as an important indication of congressional intent to speak in section 1985(3) of all deprivations of 'equal protection of the laws' and 'equal privileges and immunities under the laws,' *whatever their source.*" *Griffin*, 403 U.S. at 97 (emphasis added); *see also United States v. Williams*, 341 U.S. 70, 76, 71 S.Ct. 581, 95 L.Ed. 758 (1951) (plurality opinion of Frankfurter, J.) (finding no state action requirement in analogous equal protection provision of criminal statute); *United States v. Harris*, 106 U.S. 629, 637-39, 1 S.Ct. 601, 27 L.Ed. 290 (1883) (same).

Given the Supreme Court's rejection of the notion that state action is implicit in the concept of equal protection, we cannot find the plain language of subsection (c) inconsistent with the statute's equal benefit clause.[3]

3.

There is nothing in the legislative history of the 1991 amendments to section 1981 that prevents this court from applying subsection (c)'s plain language. Of the two House Committee Reports on the Civil Rights Act of 1991, only one even mentions subsection (c), and that discussion is terse. The House Judiciary Committee authored H.R. Report No.

---

[3]The differences in groups regulated by section 1985(3) – groups of two or more persons – and section 1981 – either individuals or groups – in no way affects whether the concept of state action is implicit in the statutes' analogous equal protection provisions. *See Griffin*, 403 U.S. at 98-99 (rejecting the argument that section 1985(3) contemplated "a private conspiracy so massive and effective that it supplants those [state] authorities and thus satisfies the state action requirement").

interpretation quite inconsistent with that given to § 1985(3) in *Collins*. In construing the exact criminal counterpart of § 1985(3), the Court in *United States v. Harris, supra*, observed that the statute was "not limited to take effect only in case [of state action]," *id., at* 639, . . . but "was framed to protect from invasion by private persons the equal privileges and immunities under the laws of all persons and classes of persons," *id.*, at 637. . . . In *United States v. Williams*, 341 U.S. 70, 95 . . . , the Court considered the closest remaining criminal analogue to § 1985(3), 18 U.S.C. § 241. Mr. Justice Frankfurter's plurality opinion, without contravention from the concurrence or dissent, concluded that "if language is to carry any meaning at all it must be clear that the principal purpose of [§ 241], unlike [18 U.S.C. § 242], was to reach private action rather than officers of a State acting under its authority. *Men who 'go in disguise upon the public highway, or upon the premises of another' are not likely to be acting in official capacities.*" 341 U.S., at 76 . . . . "Nothing in [the] terms [of § 241] indicates that color of State law was to be relevant to prosecution under it." *Id.,* at 78.

*Griffin*, 403 U.S. at 96-98 (footnotes omitted; emphases added) (overruling *Collins*, which construed § 1985(3) as requiring presence of state action).

When read in full context, rather than the selective excerpt provided by the majority, it is clear that the *explicit* mention of private persons on the face of the statute was critical to the *Griffin* court's holding that § 1985(3) applies to private action. That is, unlike § 1981, § 1985(3) expressly applies to private action by explicitly referring to "two or more persons" who conspire.[2] Therefore, if one adheres to a plain meaning

---

[2]In other words, rather than being proscriptive like § 1985(3) (providing a cause of action "[i]f two or more persons . . . conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws"), § 1981

*disguise, in particular, is in this context an activity so little associated with official action and so commonly connected with private marauders that this clause could almost never be applicable under the artificially restrictive construction of Collins [341 U.S. 651 (1951)]. And since the "going in disguise" aspect must include private action, it is hard to see how the conspiracy aspect, joined by a disjunctive, could be read to require the involvement of state officers.*

The provision continues, specifying the motivation required "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." This language is, of course, similar to that of § 1 of the Fourteenth Amendment, which in terms speaks only to the States, and judicial thinking about what can constitute an equal protection deprivation has, because of the Amendment's wording, focused almost entirely upon identifying the requisite "state action" and defining the offending forms of state law and official conduct. A century of Fourteenth Amendment adjudication has, in other words, made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons. Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State. *See, e.g., United States v. Harris*, 106 U.S. 629, 643 [1883]. . . . Indeed, the failure to mention any such requisite can be viewed as an important indication of congressional intent to speak in § 1985(3) of *all* deprivation of "equal protection of the laws" and "equal privileges and immunities under the laws," whatever their source.

The approach of this Court to other Reconstruction civil rights statutes in the years since *Collins* has been to "accord [them] a sweep as broad as [their] language." . . . Moreover, very similar language in closely relatedstatutes has early and late received an

102- 40(II), which states only that Congress intended to codify *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), and intended subsection (c) "to prohibit racial discrimination in all contracts, both public and private." H.R.Rep. No. 102-40(II), at 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 731. Congress's failure to discuss the application of subsection (c) to the other rights enumerated in subsection (a) does not properly give rise to an inference that subsection (c)'s reference to "the rights in this section" actually refers to "the contractual rights in this section." Congress's failure to comment upon statutory language simply does not constitute a rejection of the plain import of that language. Even viewed in the light most favorable to Dillard's, the legislative history of subsection (c) is equivocal. Thus, we cannot say that giving effect to subsection (c)'s plain language flouts Congress's clear intent in passing the 1991 Amendment.

4.

Dillard's also argues that application of subsection (c)'s plain language with respect to section 1981's equal benefit clause would have the "absurd" result of federalizing state tort law.

A result, however, is not absurd merely because it does not comport with one's notion of what constitutes good policy.[4] We typically embark upon the exceptional task of divining Congress's intent outside the literal language of the statute only when the statute produces a result not which we dislike but which is patently illogical or contrary to Congress's intent. *See Crooks*, 282 U.S. at 59-60 ("[T]o justify a departure from the letter of the law . . . the absurdity must be so gross as to shock the general moral or common sense. And

---

[4]Of course, "we should be and are 'reluctant to federalize' matters traditionally covered by state common law." *Patterson v. McLean Credit Union*, 491 U.S. 164, 183, 1009 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (internal quotation omitted). This reluctance, however, does not give this court leeway to ignore Congress's plain instructions.

there must be something to make plain the intent of Congress that the letter of the statute is not to prevail.").

As discussed above, the legislative history of subsection (c) is at most equivocal. There is nothing in that history evidencing Congress's intent that a plain reading of subsection (c) not prevail. Moreover, it is unlikely that application of subsection (c)'s plain language will unleash the flood of cases Dillard's predicts. The language surrounding the "full and equal benefit" clause serves to cabin both the number and nature of claims that may be brought under its ambit. The equal benefit clause may only be invoked when one party denies another the "full and equal benefit of all laws and proceedings *for the security of persons and property* as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (emphasis added). The "security of persons and property" language limits the potential class of cases that may be brought under the equal benefit provision. A litigant must demonstrate the denial of the benefit of a law or proceeding protecting his or her personal security or a cognizable property right.[5] Further, to prevail on a section 1981 claim, a litigant must prove intentional discrimination on the basis of race, which involves a high threshold of proof. Because of these significant limitations, we do not believe that the plain language of subsection (c) federalizes a wide swath of conduct traditionally covered by state common law.

Because section 1981 plainly protects against impairment of its equal benefit clause by private discrimination and

---

[5] Several cases that have allowed "full and equal benefit" claims to go forward without state action have involved serious threats to a person's security in the form of physical violence. *See, e.g., Carey v. Rudeseal*, 703 F. Supp. 929, 930 n.1 (N.D. Ga. 1988) (noting that court had allowed "full and equal benefit" claim against private actor involved in Ku Klux Klan incident because section 1981 "provides a cause of action against private individuals for racially-motivated, intentionally-inflicted injury and does not require state action in the deprivation of rights"); *Hawks v. Perillo*, 642 F. Supp. 380, 386-87, 390 (N.D. Ill. 1986) (construing language and history of statute to allow claim against private individual who engaged in vicious beating of plaintiffs motivated by racial animus).

indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C.A. § 1985(3) (West 1994). The majority notes that the *Griffin* Court expressly rejected the notion that the concept of state action is implicit in an equal protection provision, relying on the following excerpt: "A century of Fourteenth Amendment adjudication has . . . made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons. Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State." *Griffin*, 403 U.S. at 97.

To begin, the language of the two provisions are not identical. Significantly, § 1985(3) expressly references "two or more persons." Section § 1981(a) does not contain a similar reference, but simply states that "all persons shall have the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." *See Spencer*, 839 F. Supp. at 1020 n.10 ("Unlike § 1981, however, § 1985(3) contains express language encompassing 'two or more persons' who 'go on the highway' to deprive others of equal protection."); *see also Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) (observing that "[t]his statute addresses private acts–going 'in disguise on the highway' is a reference to the M.O. of the Ku Klux Klan–yet condemns only deeds that 'deprive' the victim of the 'equal protection of the laws, or of equal privileges and immunities under the laws', something within the domain of government exclusively. This admixture of private and public action has befuddled courts ever since."). This distinction is important, and key to the analysis here, as the following passage from *Griffin* reveals:

We turn, then, to an examination of the meaning of § 1985(3). On their face, the words of the statute fully encompass the conduct of private persons. The provision speaks simply of "two or more persons in any State or Territory" who "conspire or go in disguise on the highway or on the premises of another." *Going in*

remarked:   "Only the state imposes or requires 'taxes, licenses, and exactions' and the maxim *noscitur a sociis* suggests that the 'punishment, pains [and] penalties' to which the clause refers are those imposed by the state." *Mahone*, 564 F.2d at 1029-30.   A treatise has similarly observed: "Whether this clause of section 1981 is limited to state action, it is virtually inevitable that any claim based upon 'like punishment, pains, penalties, taxes, license, and exactions of every kind,' will involve a governmental entity." JOSEPH G. COOK & JOHN L. SOBIESKI, JR., 2 CIVIL RIGHTS ACTIONS, ¶ 5.03(D) (Matthew Bender & Co. 2001).

The majority's reading is internally inconsistent unless one reads subsection (c) as applying to every clause of subsection (a).  This in turn leads to the equally absurd result of holding that the like punishment clause applies to private conduct as well as state action.

### 2.

The majority claims that *Griffin v. Breckenridge*, 403 U.S. 88 (1971), precludes a finding that subsection (c)'s plain language is inconsistent with the statute's equal benefit provision.  In *Griffin*, the Supreme Court held that 42 U.S.C. § 1985(3) does not require state action but reaches private conspiracies.  Section 1985(3) provides a cause of action where "two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or

---

and are equally incapable–logically and categorically--of depriving another of the full and equal benefit of all laws and proceedings for the security of persons and property.  Only governmental actors are capable of that.

State actors and private actors are different species in the eyes of the law, with dissimilar legal properties.  Thus, laws that regulate one of these groups or classes usually are inapplicable to the other group.  That is precisely the situation in this case.  Just because Congress did not expressly state this does not mean it isn't so.  Congress also did not state that § 1981 does not apply to animals, but I do not think anyone would–or has at least as of yet– suggested that it does.

because there is no reason to look beyond section 1981's plain language, we find that Chapman states a cognizable section 1981 claim.[6]

### B.

In addition to her section 1981 claim, Chapman seeks relief under 42 U.S.C. § 1983 for violations of her right to be free from unreasonable searches and seizures under the Fourth Amendment and her due process rights under the Fifth Amendment.[7]  To state a claim under section 1983, Chapman must show that Dillard's, through its security officer, deprived her of a right secured by the Constitution or laws of the United States while acting "under color of state law." *See Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992).

A private party's actions constitute state action under section 1983 where those actions may be "fairly attributable to the state." *Lugar v Edmondson Oil Co.*, 457 U.S. 922, 947, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).  The Supreme Court has developed three tests for determining the existence of state action in a particular case: (1) the public function test, (2) the state compulsion test, and (3) the symbiotic

---

[6] In so deciding today, we agree with the Second Circuit's recent decision in *Phillip v. University of Rochester*, No. 01-7582, 2003 WL 139522 (2d Cir. Jan. 21, 2003).  Two sister circuits, in *Brown v. Philip Morris, Inc.*, 250 F.3d 789 (3d Cir. 2001), and *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851 (8th Cir. 2001), disagree with us, relying on our withdrawn panel decision in this case, on various district court decisions, and on dicta in *Mahone*.

[7] Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction therof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983 (1998).

relationship or nexus test.  *See Wolotsky*, 960 F.2d at 1335.[8] On appeal, Chapman argues that summary judgment should have been denied because there was a genuine issue of material fact regarding the existence of state action under either the public function test or the nexus test.

1.

Under the public function test, a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state.  The public function test has been interpreted narrowly.  Only functions like holding elections, *see Flagg Bros. v. Brooks*, 436 U.S. 149, 157-58, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), exercising eminent domain, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352-53, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and operating a company-owned town, *see Marsh v. Alabama*, 326 U.S. 501, 505-09, 66 S.Ct. 276, 90 L.Ed. 265 (1946), fall under this category of state action.  Our sister circuits have consistently held that the mere fact that the performance of private security functions may entail the investigation of a crime does not transform the actions of a private security officer into state action.  *See Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1457 (10th Cir. 1995); *White v. Scrivner Corp.*, 594 F.2d 140, 142-43 (5th Cir. 1979).

In *White*, for example, the Fifth Circuit held that the detention of a suspected shoplifter is not an exclusive state function.

---

[8] Citing *West v. Atkins*, 487 U.S. 42, 49-50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (public function test); *Flagg Bros. v. Brooks*, 436 U.S. 149, 157, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (same); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170, 90 S.Ct. 1598, 26 L.Ed. 2d 142 (1970) (state compulsion test); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 721-26, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (symbiotic relationship test).

for denial of accommodation based on race); *Carey v. Rudeseal*, 703 F. Supp. 929, 930 n.1 (N.D. Ga. 1988) (permitting a cause of action under the equal benefit clause against members of the Ku Klux Klan for assault); *Hawk v. Perillo*, 642 F. Supp. 380, 392 (N.D. Ill. 1985) (allowing a cause of action under the equal benefit clause against police officers who beat minority victims).

As the *Mahone* court's comments make clear,  a plain reading of subsection (c) is inconsistent with § 1981's equal benefit clause, which implicitly incorporates the concept of state action.  Only the state can prescribe laws, and only the state can deprive an individual of the benefit of those laws.  An act by a private individual which violates the legal rights of another is not the equivalent of a deprivation of the full and equal benefit of the law violated.  Stated differently, an individual is only deprived of the full and equal benefit of all laws and proceedings if he or she is impaired or prevented from enforcing through legal process his or her established rights.  To read the statute any differently is simply illogical.

If the majority's view is correct, however, one must also read subsection (c) as applying to the third clause of subsection (a), the like punishment clause.  It provides that "[a]ll persons . . . shall be subject to like punishment, pains, penalties, taxes, license, and exactions."  No one can argue seriously that an individual can subject another individual to unequal punishment or taxes.[1]  As the *Mahone* court

---

[1] Ironically, the majority actually makes an attempt.  *See Maj. Op.* at 6, n.2 ("Although not germane to Chapman's claim under section 1981's equal benefit clause, one could make a similar argument on the basis of subsection (a)'s like punishment clause.").  The majority then posits that "[t]here is nothing unworkable, however, about the proposition that a given statute may proscribe conduct beyond that which all of those persons the statute regulates are actually capable of engaging in," and provides the example of an industrial dump-truck driver who *may* be incapable of violating a high-speed limit.  The majority's argument is fallacious. Here, unlike the individual industrial dump-truck driver whose truck might not be able to exceed 75 miles per hour, private individuals are conceptually incapable of imposing taxes, licenses, and punishments,

internal quotation omitted, citing, *inter alia, Mahone*), *cert. denied*, 122 S. Ct. 1606 (2002); *Adams ex rel. Harris v. Boy Scouts of Am.-Chickasaw Council*, 271 F.3d 769, 777 (8th Cir. 2001) (same, citing *Youngblood* and *Mahone*); *Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001) (dicta) (stating that "even if were to consider them, such 'full and equal benefit' claims would fail in light of a substantial line of authority holding that only state actors can be sued under the 'full and equal benefit' clause of Section 1981"; citing *Mahone*); *Shaare Tefila Congregation v. Cobb*, 785 F.2d 523, 525-26 (4th Cir. 1986) (holding that it agreed "with the Third Circuit's interpretation of the 'full and equal benefit' clause . . . and conclude that state action is required in order to assert a claim under that statute"; citing *Mahone*), *rev'd in part on other grounds*, 481 U.S. 615 (1987). Similarly, a number of other courts that have considered the issue, both before and after the 1991 amendment, have followed the reasoning of *Mahone*. *See, e.g., Muick v Wicks*, No. 3:01-CV-0130-M, 2001 WL 1006059, at 4 (N.D. Tex. July 24, 2001) ("absent state action, Plaintiff's Section 1981 claim [under the full and equal benefit clause] is untenable and as a result, it is frivolous"); *Sterling v. Kazmierczak*, 983 F. Supp. 1186, 1192 (N.D. Ill. 1997); *Lewis v. J.C. Penney Co.*, 948 F. Supp. 367, 371 (D. Del. 1996); *Spencer v. Casavilla*, 839 F. Supp. 1014, 1018 (S.D. N.Y. 1993) ("Most of the decisions . . . have held that state action is required to state a claim under the 'equal benefit' and 'like punishment' clauses of § 1981."); *Brooks v. ABC, Inc.*, 737 F. Supp. 431, 440 (N.D. Ohio 1990), *vacated in part on other grounds*, 932 F.2d 495 (6th Cir. 1991); *Rochon v. Dillon*, 713 F. Supp. 1167, 1172 (N.D. Ill. 1989); *Thompson v. Wise General Hosp.*, 707 F. Supp. 849, 853 (W.D. Va. 1989), *aff'd*, 896 F.2d 547 (4th Cir. 1990); *Provisional Gov't of Republic of New Afrika v. ABC, Inc.*, 609 F. Supp. 104, 109 (D.D.C. 1985); *Eggleston v. Prince Edward Volunteer Rescue Squad, Inc.*, 569 F. Supp. 1344, 1353 (E.D. Va. 1983), *aff'd*, 742 F.2d 1448 (4th Cir. 1984); *Williams v. Northfield Mount Hermon Sch.*, 504 F. Supp. 1319, 1332 (D. Mass. 1981). *But see Franceschi v. Hyatt Corp.*, 782 F. Supp. 712, 724 (D.P.R. 1992) (allowing a cause of action under the equal benefit clause against a private hotel

A merchant's detention of persons suspected of stealing store property simply is not an action exclusively associated with the state. Experience teaches that the prime responsibility for protection of personal property remains with the individual. A storekeeper's central motivation in detaining a person whom he believes to be in the act of stealing his property is self-protection, not altruism. Such action cannot logically be attributed to the state.

594 F.2d at 142 (citation omitted). Applying these principles to Chapman's claim, we are satisfied that the Dillard's security officer was not performing a function exclusively reserved to the State when he stopped and searched Chapman. Under the public function test, there was no state action.

### 2.

Under the symbiotic or nexus test, a section 1983 claimant must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself. *See Wolotsky*, 960 F.2d at 1335; *see also Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (noting that a challenged activity may be state action "when it is entwined with governmental policies or when government is entwined in [its] management or control.") (internal quotation omitted); *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980) (holding that officer who shot plaintiff while officer was off-duty acted under color of state law because officer's authority to carry weapon derived from his status as police officer, conflict between officer and plaintiff arose out of officer's official duties, and plaintiff threatened officer in officer's official capacity); *Stengle v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) (concluding that off-duty police officer who shot and killed two men and paralyzed a third in a barroom brawl acted under color of law because mace spray used by officer was issued by police department, and officer carried his pistol and intervened in dispute pursuant to department regulations).

The inquiry is fact-specific, and the presence of state action is determined on a case-by-case basis. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Although "it is possible to determine . . . whether a person acted under color of state law as a matter of law, there may remain in some instances unanswered questions of fact regarding the proper characterization of the actions for the jury to decide." *Layne,* 627 F.2d at 13 (internal citations and quotations omitted).

Here, the Dillard's security officer who stopped and searched Chapman was an off-duty sheriff's deputy, wearing his official sheriff's department uniform, badge, and sidearm. Moreover, the Dillard's security officer was obligated to obey Dillard's policies and regulations while on-duty at the store. Although the state played no part in the promulgation of these policies, their strip searching provision directly implicates the state: "Strip searches are prohibited. If you suspect that stolen objects are hidden on [the shopper's] person, call the police."

During the incident at issue, the Dillard's security officer did not represent himself as a police officer, threaten to arrest Chapman, wave his badge or weapon, or establish any contact with the sheriff's department. He did however initiate a strip search by requiring Chapman to enter a fitting room with the sales manager to inspect her clothing.[9] Because Dillard's policy *mandates* police intervention in strip search situations, a reasonable jury could very well find that the initiation of a strip search by an armed, uniformed sheriff's deputy constituted an act that may fairly be attributed to the state. Additionally, if Chapman did not feel free to leave, as a result of the security officer's sheriff's uniform, his badge, or his sidearm, a reasonable jury could find the detention was a tacit arrest and fairly attributable to the state.

---

[9] Dillard's policy does not define strip searching. Because Chapman was forced to remove her clothing (i.e., she was forced to remove her coat and suit jacket, and lift up her shirt), a jury could reasonably determine that she was strip searched under the Dillard's policy.

coordinating them with the facts of a particular case may make them unclear.").

The rights in subsection (a) are not all of the same ilk, however; some protect against infractions that may be committed by both public and private actors and some protect against conduct that necessarily invokes any state action. For example, both private and public beings may enter into contracts. In fact, "[i]t is usually with another individual, not the state, that a black person would seek to make a contract; it is that other individual's racially motivated refusal to make a contract which can cause harm to the black person." *Mahone v. Waddle*, 564 F.2d 1018, 1029 (3d Cir. 1977) (dicta). Thus, subsection (c) may logically apply to the contract clause of (a).

Yet it cannot so easily be said that subsection (c) applies to the equal benefit clause of (a). As aptly stated by the Third Circuit:

> The words "full and equal benefit of all *laws* and *proceedings* for the security of persons and property" (emphasis supplied), on the other hand, suggest a concern with relations between the individual and the state, not between two individuals. The state, not the individual, is the sole source of law, and it is only the state acting through its agents, not the private individual, which is capable of denying to blacks the full and equal benefit of the law. Thus, while private discrimination may be implicated by the contract clause of section 1981, the concept of state action is implicit in the equal benefit clause.

*Id.* at 1029 (dicta).

Every court of appeals that has considered this issue, both prior and subsequent to the 1991 amendment, has shared the *Mahone* court's view. *See Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001) (stating that "[b]ecause the state is the sole source of the law, it is only the state that can deny the full and equal benefit of the law";

**(a) Statement of equal rights**

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and *to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens*, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined**

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

**(c) Protection against impairment**

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C.A. § (1981) (West 1994) (emphasis added). Congress amended § 1981 in 1991 by adding subsections (b) and (c) and designating the original section as subsection (a). Pub. L. 102-166, § 101, 105 Stat. 1071 (1991).

**1**.

Chapman's argument hinges on subsection (c). I do not disagree that subsection (c), standing alone, plainly states "[t]he *rights* protected by this section are protected against impairment by nongovernmental discrimination." Read in isolation, subsection (c) is unambiguous. But subsection (c) requires one to look elsewhere–presumably subsection (a)–to determine *which* "rights" are protected from nongovernmental discrimination. *Cf.* LIEF H. CARTER & THOMAS F. BURKE, REASON IN LAW 74-75 (Longman 6th ed. 2002) ("Even when words in isolation do seem unambiguous, the process of

---

Therefore, we find that there is a genuine issue of material fact as to whether the security officer acted under "color of state law" when he asked Chapman to enter the fitting room with the sales manager so that Chapman's clothes and person could be searched.

III.

For the foregoing reasons, we REVERSE and REMAND for further proceedings consistent with this opinion.

—————————

## DISSENT

—————————

SUHRHEINRICH, Circuit Judge, dissenting.

### I.

If there is a first principle among canons of statutory interpretation, it is that a statute is to be enforced according to the plain meaning of its terms. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *Vergos v. Gregg's Enters. Inc.*, 159 F.3d 989, 990 (6th Cir. 1998). To some extent, though, the plain meaning rule is a tautology: "Words should be read as saying what they say." *See* REED DICKERSON, THE INTERPRETATION AND APPLICATION OF STATUTES 229 (Little, Brown & Co. 1975). In other words, "[t]he rule tells us to respect meaning but it does so without disclosing what the specific meaning is." *Id.* Thus, as one commentator has observed:

> At best, [the plain meaning rule] reaffirms the preeminence of the statute over materials extrinsic to it. In its negative aspect, on the other hand, the rule has sometimes been used to read ineptly expressed language out of its proper context, in violation of established principles of meaning and communication. To this extent it is an impediment to interpretation.

*Id.*

Like most rules in law, however, this bedrock principle of statutory construction is qualified, as reflected in an early invocation of the doctrine:

> If the words convey a definite meaning, which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the legislature have the right to add to it or take from it.

*Lake County v. Rollins*, 130 U.S. 662, 670 (1889). In other words, the plain meaning command of literalness is nonetheless subject to both internal and external context. DICKERSON, *supra*, at 230 (stating that the plain meaning rule does "[n]ot quite" demand literalness, "because internal context is not excluded and external context may be taken into account to the extent of weighing the chances of absurdity").

The majority acknowledges that the "plain language" rule is subject to exceptions. *See Maj. Op.* at 5. It sees no need to resort to those exceptions, however, because it finds that §1981 is unambiguous in that subsection (c) states that "the rights protected by this section are "protected against impairment by nongovernmental discrimination," and one of the rights enumerated in subsection (a) "explicitly protects the right 'to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.'" From this the majority infers that this right is "'protected against impairment by nongovernmental discrimination.'" *Id.* Because I believe that such a literal interpretation of the statute creates internal inconsistencies, is inconsistent with the legislative history, and leads to absurd results, *see Vergos*, 159 F.3d at 990 (listing situations when courts may look beyond language of the statute), I **DISSENT.**

### II.

### A.

"In all cases of statutory construction, the starting point is the language employed by Congress." *Vergos*, 159 F.3d 989, 990 (6th Cir. 1998) (internal quotations marks omitted). Section 1981, as amended in 1991, reads as follows: