**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0204n.06

**No. 09-5558**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

CONNIE REGULI, personally and as next friend of "DAUGHTER" REGULI, a minor child,

      Plaintiffs-Appellants,

v.

SHARON GUFFEE, personally and in her capacity as Referee of Williamson County Juvenile Court; *et al.*,

      Defendants-Appellants.

                                /

---

**FILED**
**Mar 31, 2010**
LEONARD GREEN, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

OPINION

---

BEFORE:    **GUY, CLAY, and KETHLEDGE**, Circuit Judges.

**CLAY, Circuit Judge.**  Connie Reguli on behalf of herself and as next friend of her daughter, "YKR," appeals the denial of her claims of constitutional violations under 42 U.S.C. § 1983 based on her constitutional rights as a parent and her constitutional right to privacy. Plaintiffs' suit arises out of their interactions with the Williamson County, Tennessee juvenile court system. Defendants are the county itself and a series of individuals who work for the juvenile court, in law enforcement, and in various service programs. For the following reasons, the district court's judgment is **AFFIRMED**.

**FACTS**

Plaintiffs filed their initial complaint on August 12, 2008, naming Sharon Guffee, Zannie Martin, Michael LaBo, Williamson County, and the State of Tennessee as Defendants. They brought claims of constitutional violations under 42 U.S.C. § 1983; as well as claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.; the Rehabilitation Act, 29 U.S.C. § 701 *et seq*.; and a variety of state-law tort claims. An amended complaint was filed on December 9, 2008, adding as defendants Terri Bennett, Jeannie Rounsavall, Otis Coffey, Leonardo Zollicoffer, and Rhonda Casillas, all employees of Williamson County. The amended complaint also added as defendants Sally Schneider and Amber Spann, employees of Tennessee's Department of Children's Services.

On February 19, 2009, the district court dismissed most of the claims. In the memorandum and order issued that day, the district court granted the Williamson County defendants' motion for judgment on the pleadings, primarily on the basis of the *Rooker-Feldman* doctrine. In the same order, the district court granted summary judgment for Defendant LaBo because he was not a state actor. Separately, on March 31, 2009, the district court granted Schneider and Spann's motion to dismiss on the basis of absolute and qualified immunity. All of the state law tort claims were dismissed without prejudice. Plaintiffs filed a timely notice of appeal based on the dismissal of all Defendants, but contest only the constitutional issues.

The facts recounted are those alleged in Plaintiffs' amended complaint. On April 20, 2008, Reguli's 16-year-old daughter, YKR, lied to her mother and went out with a 19-year-old she had met on the internet. YKR returned home after Reguli contacted police. The police told Reguli that the only way to prosecute the 19-year-old for "contributing to the delinquency of a minor" was for Reguli to charge her own daughter as "unruly." Reguli made the charge, and YKR was transferred to the Williamson County Detention Center at 2:30 a.m., where she was released to her mother. On April 30, 2008, Reguli and her daughter appeared for a hearing in the Williamson County Juvenile

Court before a referee, Sharon Guffee. YKR was not represented by counsel. YKR signed a "Pretrial Agreement," which included handwritten additions to the normal list of restrictions, including "no contact w/Tony[1]; individual counseling; supervised computer use; Teen Peace; delete MySpace account." (Amend. Compl. ¶ 18). YKR attended "Teen Peace" meetings as instructed by the Court. Teen Peace was described as a group skills building program for dealing with anger management. The program was moderated by Michael LaBo, who has no mental health license.

On June 11, 2008, Spann, an employee with the Department of Child Services ("DCS"), arrived at Reguli's home without notice. Reguli was not home. Spann called Reguli who told Spann to leave the property. Spann was aware that Reguli, a family law attorney, had previously challenged DCS's interference with a family in another Tennessee county. Spann told Reguli that she knew Reguli would not allow her to talk to Reguli's children.

The next day, June 12, 2008, Reguli and YKR appeared before Guffee for the scheduled review date. Schneider, the attorney for DCS, told the referee that DCS needed to interview all of Reguli's children and requested an order for Reguli to bring her other two children to the courthouse for an interview. Spann offered a "safety plan" that would allow Reguli to voluntarily remove the children from her home and place them at their grandmother's. When Reguli refused, Spann threatened to forcefully remove the children and called a judge to request an emergency removal. The request was denied. DCS asserted that LaBo, the Teen Peace moderator, had removed YKR from the group setting for a one-on-one interview where YKR stated that she had been hit and choked by Reguli. In response, Reguli objected to the continued use of Teen Peace and argued that YKR's statement to LaBo was not a "reasonable" grounds for DCS to get involved. Guffee refused

---

[1]All parties assume that "Tony" was the name of the 19-year-old who took YKR out on April 20th.

to allow Reguli to leave the courthouse until Reguli agreed to bring the children to the courthouse the following morning. Reguli returned the next morning with all three children.

An order from the June 12, 2008 hearing was entered on June 19, 2008. The referee appointed a guardian ad litem for YKR. The referee ordered that all the children be interviewed outside the presence of Reguli and ordered Reguli to submit to an interview with Spann. Following the interviews, no finding of a "risk of harm" was made, but the referee ordered Reguli to cooperate with the DCS investigation. Guffee further placed YKR on in-home detention, ordered her to participate in Y-CAP[2], ordered her not to use the computer, ordered Reguli not to allow YKR to use the computer, required participation by YKR in individual counseling, and ordered an assessment by the Family Crisis Intervention Program.

YKR violated the court order by leaving home on the night of June 24, 2008. She was eventually located seven days later with her boyfriend. Reguli tried to bring her home, but YKR escaped before eventually being transported to Williamson County Juvenile Services. She was incarcerated from July 3, 2008 until July 7, 2008 over Reguli's objection. At a July 7, 2008 detention hearing, Guffee ordered YKR be placed on an ankle monitor, that she attend Y-CAP, that she have no computer or cell phone access, that any computer be removed from the home, that Reguli submit to a parenting assessment, and that YKR participate in counseling and complete the Teen Peace Anger Management Program.

Reguli filed a motion on July 9, 2008 to alter or amend the referee's order. The motion wanted to strike the restrictions that supposedly interfered with Reguli's right to parent, specifically challenging the ankle bracelet, the parenting assessment, and the Teen Peace requirements. On July

_____

[2]Plaintiffs do not define Y-CAP in their brief or complaint, but Y-CAP is likely an acronym for YMCA Community Action Programs, which, according to its website, has the mission of "Redirecting Youth Behavior by Teaching Values and Rebuilding Families."

14, 2008, Reguli filed a further objection based on the qualifications of Dr. Kaforey, the doctor assigned to do the parenting assessment. Dr. Kaforey had a Ph.D. in "Sports Studies." Reguli also objected to the fact that LaBo was not a licensed mental health professional.

On July 22, 2008, the Youth Service Officer ("YSO") department left a message for Reguli. The next day, Reguli returned the call and spoke with YSO Martin who told Reguli that YKR had been just outside the boundary of her yard for a couple of hours at midnight on July 20, 2008 and that she had also answered a phone call on a cell phone number Martin had called. Both acts were in violation of the previous court order, and YKR was arrested at her home on July 23, 2008. YKR was held without bond, and Reguli was not allowed to visit her before a hearing the next day, July 24, 2008. YKR was represented by a court-appointed attorney at the July 24th hearing, and she pled guilty to all counts. YKR was released to Reguli under in-home detention. On July 25, 2008, Reguli filed a notice of appeal.

At the July 24, 2008 hearing, Guffee denied Reguli's motion to alter or amend the court's previous order. Guffee ordered Reguli to submit a letter signed by the counselor confirming ongoing counseling by July 31, 2008. On July 31, 2008, Reguli provided a letter by 9:00 am, as instructed. Martin telephoned to say that the letter was insufficient and required Reguli to appear in court on August 4, 2008. No formal written notification was ever provided to Reguli of the August 4, 2008 court date. Reguli appeared two hours late for the hearing. YKR was at work and did not attend the court date. Guffee was unhappy that YKR was not present and ordered Reguli to immediately go and get her, or YKR would face incarceration. Guffee further ordered Reguli's removal from the courtroom by a sheriff. Additionally, the referee issued a body attachment on YKR.

Also on August 4, 2008, a petition for violation of a valid court order was initiated by Defendant Bennett against Reguli. The petition alleged that "it was reported" that Reguli was not

willing to communicate the whereabouts of YKR, in violation of the July 7, 2008 order. On August 5, 2008, Defendant Rounsavall filed a petition for violation of a valid court order.

On August 11, 2008, Defendant Coffey took YKR's sibling, VRR, out of her class at high school to interrogate her about YKR without the consent of Reguli.

On September 9, 2008, Reguli filed a Petition for Writ of habeas corpus on the body attachment order of August 4, 2008. The next day, September 10, 2008, YKR was removed from her place of employment and incarcerated based on the August 4, 2008 body attachment. The arrest included restricting YKR's hands with twist ties that caused lacerations.[3] On September 17, 2008, YKR's attorney, the guardian ad litem, and the Williamson County Court reached an agreement, without Reguli's participation, that continued to restrict the freedom of movement of YKR, restricted her from otherwise legal activities, and compelled mental health intervention.

## DISCUSSION

### I. Williamson County Defendants

#### A. *Rooker-Feldman* Doctrine

Many of the claims against the Williamson County defendants were dismissed on the basis of the *Rooker-Feldman* doctrine. This Court reviews *de novo* the district court ruling that the *Rooker-Feldman* doctrine precluded subject matter jurisdiction. *McCormick v. Braverman*, 451 F.3d 382, 389 (6th Cir. 2006). A defendant can challenge this Court's jurisdiction on its face through a Rule 12(b)(1) motion. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). In that case, "all allegations of the plaintiff must be considered as true." *Id*.

---

[3]Plaintiffs do not assert a claim for excessive force against the arresting officers.

The *Rooker-Feldman* doctrine derives its name from two Supreme Court cases that held that a federal court cannot exercise appellate review of a state court decision. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

> *Rooker* and *Feldman* exhibit the limited circumstances in which [the Supreme Court's] appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority. In both cases, the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment. Plaintiffs in both cases, alleging federal-question jurisdiction, called upon the District Court to overturn an injurious state-court judgment. Because § 1257, as long interpreted, vests authority to review a state court's judgment solely in [the Supreme] Court, the District Courts in *Rooker* and *Feldman* lacked subject-matter jurisdiction.

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 291-92 (2005) (citations and quotations omitted). *Rooker-Feldman* applies "when a plaintiff asserts before a federal district court that a state court judgment itself was unconstitutional or in violation of federal law." *McCormick*, 451 F.3d at 395.

The key inquiry in deciding whether *Rooker-Feldman* applies is determining the source of the plaintiffs' alleged injury. "If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *Id* at 393. The majority of claims against the Williamson County defendants could be read as challenges to state court orders which are barred by the *Rooker-Feldman* doctrine.

Specifically, Count I alleges a violation of Plaintiffs' constitutional right of liberty and privacy based on five acts taken by Guffee that stemmed directly from her orders. Plaintiffs also allege that Guffee and other defendants "unlawfully conspired and orchestrated the ex parte deprivation of right as against the child," but the only action alleged was again an order from Guffee.

Plaintiffs' other allegations of constitutional violations against Guffee also stem from court orders. For instance, in ¶ 77 of the amended complaint, Plaintiffs challenge the body attachment issued by Guffee.[4] In ¶ 80, Plaintiffs challenge a settlement negotiated by the juvenile court that had the force of a court order. In ¶ 81, Plaintiffs challenge the incarceration of YKR. To the extent that Plaintiffs include the other Williamson County defendants acting in concert with Guffee, the *Rooker-Feldman* doctrine should apply with equal force.[5] The injury alleged by Plaintiffs in all of these allegations is a direct result of the judicial order and fails to assert an "independent claim" that would bring the case outside the ambit of *Rooker-Feldman*. *See Exxon Mobil*, 544 U.S. at 293 (finding that if a plaintiff "presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction . . .") (citations and quotations omitted).[6]

_____

[4]The complaint against defendants Zollicoffer and Casillas, who arrested YKR, must be dismissed. Plaintiffs' allegations are that Zollicoffer and Casillas violated YKR's constitutional rights by incarcerating her on the basis of an "invalid" body attachment. The officers were merely enforcing a valid court order, and the fact that the order emanated from a supposedly unconstitutional statute has no impact on the liability of the individual officers. These officers are entitled to quasi-judicial immunity. *See Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994) (finding quasi-judicial immunity applied for defendant who carried out a court order because "enforcing or executing a court order is intrinsically associated with a judicial proceeding").

[5]In the alternative, the district court found that Guffee was protected by absolute judicial immunity, since "a referee has the same authority as the judge to issue any and all process. The referee in the conduct of the proceedings has the powers of a trial judge." Tenn. Code Ann. § 37-1-107(c). Since *Rooker-Feldman* denies this Court jurisdiction, we need not reach this issue.

[6]We emphasize that *Rooker-Feldman* will not always be applicable in suits against judicial officers, who are generally protected by judicial immunity. *See Snyder v. Nolen*, 380 F.3d 279, 289 n.10 (7th Cir. 2004) (acknowledging the "tension between the doctrine of absolute judicial immunity and the application of the *Rooker-Feldman* doctrine to suits for damages against state judicial officers"). "We stress that the *Rooker-Feldman* doctrine is not a panacea to be applied whenever state court decisions and federal court decisions potentially or actually overlap." *McCormick*, 451 F.3d at 395. Nonetheless, *McCormick* clearly states that *Rooker-Feldman* applies "when a plaintiff asserts before a federal district court that a state court judgment itself was unconstitutional or in violation of federal law." *Id*. Plaintiff's allegations against Guffee undoubtedly constitute an

Plaintiffs rely on a Seventh Circuit decision that is easily distinguishable. *See Brokaw v. Weaver*, 305 F.3d 660 (7th Cir. 2002). In *Brokaw*, the plaintiff brought suit against defendants in the child neglect office based on a conspiracy to take away her children. Crucially, Brokaw alleged that "the defendants conspired – prior to any judicial involvement – to cause false child neglect proceedings to be filed." *Id*. at 665. The Seventh Circuit specifically held that the plaintiff "is not merely claiming that the decision of the state court was incorrect or that the decision violated her constitutional rights; rather, she is alleging that the people involved in the decision to forcibly remove her from her home and her parents and subject her to the custody of the IDCFS violated her constitutional rights, independently of the state court decision." *Id*. Here, the orders issued by Guffee were the state court decisions themselves, and proceedings only began because Reguli herself charged her daughter as unruly.

The reasoning of *Brokaw* does apply to other claims brought by the Plaintiffs against some of the Williamson County defendants. Various allegations in the complaint could be read to allege direct violations of Plaintiffs' supposed constitutional rights, without the formal mechanisms of the court proceedings. These include allegations that defendant Martin deceived Reguli in a phone conversation about the purpose of an August 4, 2008 hearing. Additionally, Plaintiffs allege that defendant Coffey conducted an unlawful search and seizure by removing minor child VRR from her public school class for an interrogation. As discussed below, these allegations fail because they are not constitutional violations, but we are not denied jurisdiction on those claims by the *Rooker-Feldman* doctrine.

Finally, Plaintiffs argue that even if some of the court rulings are protected by *Rooker-Feldman*, all court orders entered after Plaintiff filed a state court appeal of the referee's decision are

attempt to have a federal court review the constitutionality of the juvenile court decisions.

invalid.  Plaintiffs allege that their appeal stripped the referee of jurisdiction, invalidating her orders.

The main order Plaintiffs challenge after the notice of appeal was filed is the body attachment on

YKR.  The Tennessee Code clearly states that "an appeal does not suspend the order of the juvenile

court, nor does it release the child from custody of that court." Tenn. Code Ann. § 37-1-159(b).  The

body attachment in this case was issued because YKR violated a previous order, which was still in

force pending the appeal.  The district court read the relevant statute to allow Guffee to issue the

body attachment to "enforce" her prior order.  We need not decide whether the juvenile court

definitively had jurisdiction to issue the body attachment.[7]  Plaintiffs' underlying claim is that the

juvenile court order violated their constitutional rights.  This Court cannot consider "whether a state

court judgment itself was unconstitutional." *McCormick*, 451 F.3d at 395.  Even if issued without

jurisdiction, the order was still issued by a state court, and *Rooker-Feldman* bars a federal court from

reviewing the constitutionality of that order.[8]

## B.        Additional Williamson County Defendants

*Rooker-Feldman* disposes of the majority of claims against the Williamson County

defendants.  Several miscellaneous allegations in Plaintiffs' complaint do not fit neatly under this

---

[7]This argument actually goes to the heart of Guffee's alternative defense, judicial immunity. Reguli attempts to import that framework into a *Rooker-Feldman* analysis.  Plaintiffs are correct that a judicial officer can be found liable for damages if he has acted in the "clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349 (1978).  However, "the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge.  A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority." *Id*. at 356.  Even under judicial immunity, this challenge would likely fail, since Guffee did not act in the "clear absence of all jurisdiction."

[8]Plaintiffs also allege that the "Williamson County Juvenile Court" violated their constitutional rights by incarcerating YKR without an appearance bond on three occasions and twice denying YKR the right to visit or communicate with her parent "in violation of the Rules of the Juvenile Court." (Amen. Compl. ¶ 83).  Plaintiffs offer no support for the proposition that these acts are constitutional violations, nor do they even specify what constitutional right was violated.

rubric and must be addressed separately. All of these claims were dismissed on Defendants' motion to dismiss or for judgment on the pleadings and must therefore be reviewed *de novo*. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

Plaintiffs make several allegations against defendant Martin, a youth services officer of the juvenile court. They allege that Martin "denied due process of the mother" by stating falsely in a phone call the purpose of the August 4th hearing and by presenting evidence "without regard for the due process of the Mother and YKR." (Amen. Compl. ¶ 74). The phone call from Martin simply does not violate Plaintiffs' constitutional rights, inasmuch as conveying incorrect information about the purpose of the August 4, 2008 hearing did not rise to the level of a due process violation. Reguli eventually appeared and was given a further opportunity to bring YKR to court. She refused, and at that point, the body attachment on YKR was issued. Therefore, Plaintiffs have not asserted in their complaint how this alleged falsehood by Martin created a constitutional injury.

The second allegation against Martin, presenting evidence before the referee, is shielded by the doctrine of absolute immunity, which covers "testimony or recommendations given in court." *Holloway v. Brush*, 220 F.3d 767, 776 (6th Cir. 2000). This principle also covers the alleged conduct of defendants Bennett and Rounsavall. Those two employees had merely filed petitions in court proceedings, core prosecutorial functions and undoubtedly subject to absolute immunity. In *Holloway*, this Court held that "social workers are absolutely immune only when they are acting in their capacity as *legal advocates* – initiating court actions or testifying under oath." *Id*. at 775. The allegations against Martin involve his testimony under oath, and the allegations against Bennett and Rounsavall involve their initiation of court proceedings.

The final Williamson County defendant is Coffey who entered the school of VRR to investigate the abuse allegations. The claim is not cognizable because the daughter interrogated by

Coffey at the school is not a plaintiff in this case. Therefore, Plaintiffs do not have standing to challenge the questioning of this daughter as an illegal search and seizure. On appeal, Plaintiffs argue that "the Mother of a minor child has standing to bring this action as a violation of her (Mother's) constitutional right of privacy and her right to parent." (Pls. Br. at 31). The complaint, however, alleges an illegal search and seizure, and Plaintiffs cannot change their theory on appeal. On the merits, Plaintiffs cite no case law indicating that questioning a daughter in school where allegations of abuse have occurred constitutes a constitutional violation. *See Williams v. Pollard*, 44 F.3d 433, 435 (6th Cir. 1995) (finding that two and one-half hour interview of minor child without notifying parent "did not violate a federally protected right").

## II.     Department of Children's Services Defendants

Defendants Schneider and Spann's motion to dismiss was granted by the district court on the basis of absolute and qualified immunity. "Whether a defendant is entitled to absolute or qualified immunity from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo*." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

Schneider and Spann were employees of the Tennessee Department of Children's Services. Agency officials who "perform functions analogous to a prosecutor are entitled to absolute immunity." *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984) (citing *Butz v. Economou*, 438 U.S. 478 (1978)). In *Kurzawa*, the Court granted absolute immunity to a psychologist and two psychiatrists whose findings following an examination of a minor child "are used by the Department of Social Services and the Michigan courts to determine what environment best serves the interests of the child." *Kurzawa*, 732 F.2d at 1458. These actions contrast with the actions of social workers that were not entitled to immunity in *Achterhof v. Selvaggio*, 886 F.2d 826 (6th Cir. 1989). In that case, social workers were not granted absolute immunity where their actions were "only

investigatory or administrative in nature, not prosecutorial, judicial or otherwise intimately related to the judicial process." *Id*. at 830.

Schneider and Spann emphasize that their actions were "intimately involved in the judicial process." *Id*; *Rippy v. Hattaway*, 270 F.3d 416 (6th Cir. 2001). Undoubtedly, some of the accusations against the DCS employees were based on activities that were "intimately involved in the judicial process." The complaint asserts that when Reguli failed to sign a safety plan, Spann called a judge to request emergency removal of the Reguli children. The complaint also challenges testimony by the DCS defendants before the referee and refers to an in-court interview with the children at the direction of the referee. These acts are entitled to absolute immunity, as is evident from the case relied on by Plaintiffs, *Holloway v. Brush*, 220 F.3d 767 (6th Cir. 2000). In *Holloway*, the Court found that a social worker was not entitled to absolute immunity where her actions were not "testimony or recommendations given in court concerning the children's best interests as she saw the matter." *Id*. at 776. The vast majority of the allegations against Schneider and Spann, however, deal with actions directly related to the court proceedings for which they should be entitled to absolute immunity.

The district court found that all the allegations against Schneider and Spann were barred by absolute immunity. We believe that several claims are outside the ambit of actions intimately involved in the judicial process. First, Spann appeared at the home of the Mother to "investigate" YKR's abuse allegations. Second, both Schneider and Spann threatened removal of the children if Reguli refused to participate in the interview process. These actions, however, are protected by qualified immunity. Plaintiffs cannot "simply identify a clearly established right in the abstract and allege that the defendant has violated it. Instead, the plaintiff must show a substantial correspondence between the conduct in question and prior law allegedly establishing the defendant's

actions were clearly prohibited." *Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996) (citations omitted). Plaintiffs have made no such showing, and it is not clear what constitutional rights Schneider and Spann allegedly violated.

Plaintiffs make an additional argument that the allegations of abuse by YKR, who was adjudged delinquent in part because she lied to her mother, were not sufficiently "reasonable" to trigger DCS involvement. Reguli's argument invites us to take the position that a statement by a teenager of abuse is not "reasonable" grounds for starting an investigation merely because the teen has been known to lie about other matters. We do not accept the invitation. The alleged victim made the accusation, and it is preposterous to argue that the agency cannot begin an investigation based on a teenager's accusations. DCS undoubtedly had a right to begin an investigation, and this Court has previously granted qualified immunity for much more intrusive actions taken by similar agencies. *See, e.g.*, *Williams v. Pollard*, 44 F.3d 433, 435 (6th Cir. 1995) (holding that "it is objectively reasonable for a social worker receiving an abuse referral from school officials to believe that interviewing the child . . . without notifying the parents did not violate a federally protected right").

## III.    Defendant LaBo

Defendant LaBo was granted summary judgment on the constitutional claims because the district court found that he was not a state actor. "We conduct *de novo* review of decisions granting summary judgment, drawing all reasonable inferences in favor of the nonmoving party." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006) (citations and quotations omitted).

LaBo was the director of the Teen Peace program that YKR was required by court order to attend. Plaintiffs argue that since YKR was required to attend Teen Peace based on a court order from the state, and LaBo had responsibilities under the court order to report noncompliance by YKR,

LaBo was a state actor. Plaintiffs must satisfy one of three tests to show that LaBo is a state actor: (1) the public function test; (2) the state compulsion test; or (3) the symbiotic relationship or nexus test. *See Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (*en banc*). It is unclear on appeal what test or tests Plaintiffs believe they can satisfy. They argue: "Teen Peace existed for the purpose of providing this service to the Court, became an integral part of the Court order, was compelled to report to the Court, and had the power to have children and parents incarcerated for failure to comply with their restrictions." (Pls. Br. at 34-35). Since we cannot discern under what theory Plaintiffs believe LaBo is a state actor, we review all three tests.

Under the public function test, a private party is a state actor if he exercises powers traditionally reserved exclusively to the state. *Chapman*, 319 F.3d at 833. "The public function test has been interpreted narrowly. Only functions like holding elections, exercising eminent domain, and operating a company-owned town, fall under this category of state action." *Id.* (citations omitted). Providing counseling services to teenagers is not a power reserved exclusively to the state. Even if LaBo's involvement were read more broadly to include providing court-ordered services to delinquents, the Court "conducts a historical analysis to determine whether the party has engaged in an action traditionally reserved to the state, and the plaintiff bears the burden of making that showing." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003). Plaintiffs have made no such historical argument in this case.

LaBo is also not a state actor under the state compulsion test. "The state compulsion test requires that a state 'exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state.'" *Lansing v. City of Memphis*, 202 F.3d 821, 829 (6th Cir. 2000) (quoting *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)). No evidence in the record indicates that LaBo is coerced by the state in his

provision of services. Undoubtedly, LaBo was providing a service for the state, but the state did not control his actions in such a manner that it is responsible for his conduct. Plaintiffs have come forward with no evidence about the relationship between LaBo/Teen Peace and the state, the extent to which the state dictates to Teen Peace what services it must provide, the percentage of Teen Peace's money that it receives from the state, or any other factor that would indicate the possibility of state coercion. *See Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007) (finding that to satisfy the state compulsion test, "a plaintiff must allege and prove that state officials coerced or participated" in a company's decision-making).

Finally, LaBo is not a state actor under the nexus test. "Under the nexus test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *S.H.A.R.K. v. Metro Parks Serving Summit Co.*, 499 F.3d 553, 565 (6th Cir. 2007) (citation and quotation omitted). The Supreme Court has found state action based on "pervasive entwinement" between a private actor and the state. *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 291 (2001).

In this case, the alleged actions of LaBo were not in any way connected with the state. Most prominently, Plaintiffs allege that LaBo "without jurisdiction or authority took the minor child out of the group setting under which he was ordered to conduct [sic]." (Amen. Compl. ¶ 75). The state had no role in how LaBo conducted his evaluations and certainly was not involved in the decision to take YKR out of the group setting. To support their claim that LaBo was a state actor, Plaintiffs merely assert that "Labo was appointed by the Court for a specific purpose, therefore he served in an extra-judicial capacity in which he was required to perform specific acts and report directly to the Court. As an extra-judicial personnel, Labo had a duty to protect the constitutional rights of the

litigants." (Amen. Compl. ¶ 75). Plaintiffs cite no cases to support their proposition that when a private not-for-profit receives cases from the juvenile court, they automatically become a state actor. LaBo's actions simply do not have a sufficient nexus to the state. LaBo met with YKR on four occasions. He submitted two reports to the juvenile court. The first recounted YKR's allegations of abuse, as mandated by Tenn. Code Ann. § 37-1-403. The second report merely stated that YKR had stopped attending Teen Peace meetings.

While not binding authority on this Court, we agree with analysis from the Ninth Circuit in a case alleging constitutional violations by a court-appointed guardian ad litem. *Kirtley v. Rainey*, 326 F.3d 1088, 1095 (9th Cir. 2003). In considering the "nexus test," the Court found:

> [T]here are significant links between the position of the guardian and the government. As [plaintiff] observes, the guardian is appointed by a state actor, is paid by the state, and is subject to regulation by state law. But there the nexus ends. Where the guardian reports to the court, she reports as an independent investigator. Where the guardian acts as an advocate of the child, she occupies a role distinct from the court before which she advocates.

*Id*. at 1095. *See also Holley v. Deal,* 948 F. Supp. 711, 715 (M.D. Tenn. 1996) (guardian ad litem is not a state actor where "state exercised no coercive power over [defendant's] independent judgment . . .").

We further agree with the Ninth Circuit that "it is conceivable that a more expansive type of guardianship role could satisfy the nexus test." *Kirtley*, 326 F.3d at 1095. We can imagine that some court-appointed programs for juveniles could be sufficiently intertwined with state functions that the participants can be found to be state actors. Here, however, the only nexus presented by Plaintiffs is that the juvenile court ordered YKR into the Teen Peace program, and LaBo had reporting requirements back to the juvenile court. Plaintiffs have not cited, and we are not independently aware of, any case where the mere referral to a private entity confers state actor status

on an otherwise private entity. While Plaintiffs' complaint makes allegations that LaBo had control over what happened to YKR in the juvenile court proceedings, she has come forward with no evidence that the reports of a private individual had a binding impact on the court. These referral and reporting requirements are insufficient to make LaBo's personal actions in providing counseling services through Teen Peace state action, and summary judgment for LaBo was therefore appropriate.

## CONCLUSION

For the foregoing reasons, the judgment of the district is **AFFIRMED**.